# BEDROC LIMITED, LLC, ET AL. *v.* UNITED STATES ET AL.

No. 02–1593.   Argued January 20, 2004—Decided March 31, 2004

*R. Timothy McCrum* argued the cause for petitioners. With him on the briefs were *Clifton S. Elgarten* and *Ellen B. Steen.*

*Assistant Attorney General Sansonetti* argued the cause for respondents. With him on the brief were *Solicitor General Olson, Deputy Solicitor General Kneedler, Dan Himmelfarb, William B. Lazarus, Elizabeth Ann Peterson,* and *Blaine T. Welsh.*[*]

CHIEF JUSTICE REHNQUIST announced the judgment of the Court and delivered an opinion, in which JUSTICE O'CONNOR, JUSTICE SCALIA, and JUSTICE KENNEDY join.

The question here is whether sand and gravel are "valuable minerals" reserved to the United States in land grants issued under the Pittman Underground Water Act of 1919 (Pittman Act or Act), ch. 77, 41 Stat. 293. We hold they are not.

Beginning with the Homestead Act of 1862, ch. 75, 12 Stat. 392, and stretching into the early 20th century, Congress enacted a series of land-grant statutes aimed at settling the American frontier. One of these was the Pittman Act. That Act sought to succeed where earlier homestead laws had failed: promoting development and population growth in the State of Nevada. H. R. Rep. No. 286, 66th Cong., 1st

---

[*]Briefs of *amici curiae* urging reversal were filed for Associated General Contractors of America et al. by *Ross E. Davies;* and for the National Stone, Sand & Gravel Association by *Laura Lindley* and *Christopher G. Hayes.*

Sess., 2 (1919).[1] It was thought that Nevada's lack of surface water resources was hindering its agricultural progress. *Ibid.* After rejecting various proposals to directly fund exploration for underground water, Congress enacted the Pittman Act to encourage private citizens to prospect for water in Nevada. *Id.,* at 1.

Nevada lies in the heart of the Great Basin, that part of the United States lying roughly between the Sierra Nevada Range on the west and the Wasatch and other mountain ranges on the east. The western face of the Sierra Nevada blocks rain-bearing winds off the Pacific Ocean from reaching the Great Basin, forming a rain shadow over the entire region. Nevada has, on the average, less precipitation than any other State in the Union. This is one reason why most of its rivers, instead of eventually flowing into the sea, disappear into "sinks." 5 The New Encyclopaedia Britannica 442 (15th ed. 1985); Department of Agriculture Yearbook, Climate and Man 987–988 (1941) (cited in *Nevada* v. *United States,* 463 U. S. 110, 114 (1983)).

The Pittman Act authorized the Secretary of the Interior to designate certain "nonmineral" lands[2] in Nevada, on which settlers could obtain permits to drill for water. §§ 1–2, 41 Stat. 293–294. Any settler who could demonstrate successful irrigation of at least 20 acres of crops was eligible for a land grant, or patent, of up to 640 acres. § 5, *id.,* at 294. Of central importance here, each patent issued under the Act was required to contain "a reservation to the United States of all the coal and other valuable minerals in the lands . . . , together with the right to prospect for, mine, and remove the same." § 8, *id.,* at 295. By virtue of this

---

[1] The population of Nevada in 1910 was only 81,875; by 1920, it had fallen to 77,407. Less than 11% of Nevada's 112,000 square miles of land was privately owned. H. R. Rep. No. 286, at 2.

[2] "Nonmineral" lands are "more valuable for agricultural or other purposes than for the minerals [they] contai[n]." *Watt* v. *Western Nuclear, Inc.,* 462 U. S. 36, 48, n. 9 (1983).

reservation, the United States was free to dispose of the "coal and other valuable mineral deposits in such lands" in accordance with "the provisions of the coal and mineral land laws in force at the time of such disposal." *Ibid.*

The Pittman Act failed to significantly advance agricultural development in Nevada, S. Rep. No. 1282, 88th Cong., 2d Sess., 1 (1964), and Congress repealed it in 1964, Pub. L. 88–417, 78 Stat. 389. The repealing legislation, however, expressly reserved the rights of existing patentees. *Ibid.*

Two such patentees, Newton and Mabel Butler, were the predecessors-in-interest of the petitioners in this case. In 1940, the Butlers obtained a patent for 560 acres of land in Lincoln County, some 65 miles north of Las Vegas. As required by the Act, the patent reserved the "coal and other valuable minerals" to the United States. Common sand and gravel were plentiful and visible on the surface of the Butlers' land, but there was no commercial market for them due to Nevada's sparse population and the land's remote location. App. 10, 11.

Earl Williams acquired the Butler property in 1993. By that time, the expansion of Las Vegas had created a commercial market for the sand and gravel on the land. Shortly after Williams began extracting the sand and gravel, however, the Bureau of Land Management (BLM) served him with trespass notices pursuant to 43 CFR § 9239.0–7 (1993) (providing that any unauthorized removal of "mineral materials" from public lands is "an act of trespass"). When Williams challenged the notices, the BLM ruled that by removing sand and gravel Williams had trespassed against the Government's reserved interest in the "valuable minerals" on the property. The Interior Board of Land Appeals affirmed that decision. *Earl Williams,* 140 I. B. L. A. 295 (1997). Meanwhile, petitioner BedRoc Limited, LLC (Bed-Roc), acquired the Butler property from Williams in 1995.[3]

---

[3] In 1996, BedRoc conveyed 40 of its 560 acres to petitioner Western Elite, Inc.

BedRoc continued to remove sand and gravel under an interim agreement with the Department of the Interior, pending final resolution of the ownership dispute.

Petitioners filed an action in the United States District Court seeking to quiet title to the sand and gravel on the Butler property. The District Court granted summary judgment to the Government, holding that the contested sand and gravel are "valuable minerals" reserved to the United States by the Pittman Act. 50 F. Supp. 2d 1001 (Nev. 1999). The United States Court of Appeals for the Ninth Circuit affirmed, relying primarily on the legislative history of the Pittman Act and our decision in *Watt* v. *Western Nuclear, Inc.*, 462 U. S. 36 (1983). 314 F. 3d 1080 (2002). We granted certiorari, 539 U. S. 986 (2003), and now reverse.

In *Western Nuclear, supra,* we construed the mineral reservation in the Stock-Raising Homestead Act of 1916 (SRHA), 39 Stat. 862, 43 U. S. C. § 291 *et seq.*—"the most important . . . land-grant statut[e] enacted in the early 1900's." 462 U. S., at 47. Unlike the Pittman Act, the SRHA was not limited to Nevada; it applied to any "public lands" the Secretary of the Interior designated as "'stock-raising lands.'" 43 U. S. C. § 291 (1976 ed.) (repealed by Pub. L. 94–579, 90 Stat. 2787). A person could obtain a patent under the SRHA if he resided on stockraising lands for three years, § 291, and "ma[de] permanent improvements upon the land . . . tending to increase the value of the [land] for stock-raising purposes," § 293 (repealed by Pub. L. 94–579, 90 Stat. 2787). The SRHA's mineral reservation was identical to the Pittman Act's in every respect, save one: Whereas the SRHA reserved to the United States "all the coal and other minerals," § 299 (2000 ed.), the Pittman Act reserved "all the coal and other *valuable* minerals," § 8, 41 Stat. 295 (emphasis added).

The question before us in *Western Nuclear* was "whether gravel found on lands patented under the [SRHA] is a mineral reserved to the United States." 462 U. S., at 38. A

closely divided Court held that it is. *Id.*, at 60. After determining that "neither the dictionary nor the legal understanding of the term 'minerals' that prevailed in 1916 sheds much light on the question before us," we turned to the purpose and history of the SRHA. *Id.*, at 46–47. We observed that the SRHA, like other land-grant Acts containing mineral reservations, sought to "facilitate development of both surface and subsurface resources." *Id.*, at 49–52. We therefore reasoned that "the determination of whether a particular substance is included in the surface estate or the mineral estate should be made in light of the use of the surface estate that Congress contemplated." *Id.*, at 52. Accordingly, we interpreted the SRHA's mineral reservation to include "substances that are mineral in character (*i. e.*, that are inorganic), that can be removed from the soil, that can be used for commercial purposes, and that there is no reason to suppose were intended to be included in the surface estate." *Id.*, at 53. Because we thought it unlikely that Congress would have made the exploitation of gravel deposits dependent on farmers and ranchers "whose interests were known to lie elsewhere," and because gravel met our other criteria, we concluded that it is indeed a "mineral" reserved to the United States. *Id.*, at 55–60.[4]

The Government argues that our rationale in *Western Nuclear* compels the outcome in this case, notwithstanding the Pittman Act's seemingly narrower reservation of "valuable" minerals. Petitioners, for their part, argue that *Western*

---

[4] Four Justices vigorously disagreed with the Court's approach. *Id.*, at 60–72 (Powell, J., joined by REHNQUIST, STEVENS, and O'CONNOR, JJ., dissenting). The dissenters pointed out that at the time the SRHA was enacted the Department of the Interior "had ruled consistently that gravel was not a mineral under the general mining laws." *Id.*, at 62–67. Furthermore, the ultimate congressional purpose behind the SRHA was settling the West, not stockraising, the dissenters argued, and this purpose would have been thwarted if potential settlers thought the Government had reserved "commonplace substances that actually constitute much of the soil." *Id.*, at 71–72.

*Nuclear* should be distinguished on this ground or, in the alternative, overruled altogether. While we share the concerns expressed in the *Western Nuclear* dissent, see n. 4, *supra*, we decline to overrule our recent precedent. By the same token, we will not extend *Western Nuclear*'s holding to conclude that sand and gravel are *"valuable* minerals."

Whatever the correctness of *Western Nuclear*'s broad construction of the term "minerals," we are not free to so expansively interpret the Pittman Act's reservation. In *Western Nuclear*, we had no choice but to speculate about congressional intent with respect to the scope of the amorphous term "minerals." Here, by contrast, Congress has textually narrowed the scope of the term by using the modifier "valuable."[5]

The preeminent canon of statutory interpretation requires us to "presume that [the] legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253–254 (1992). Thus, our inquiry begins with the statutory text, and ends there as well if the text is unambiguous. *Lamie* v. *United States Trustee*, 540 U. S. 526, 534 (2004); *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.*, 530 U. S. 1, 6 (2000); *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432, 438 (1999); *Connecticut Nat. Bank, supra*, at 254. We think the term "valuable" makes clear that Congress did not intend

---

[5] Despite the textual difference, JUSTICE STEVENS nonetheless finds *Western Nuclear* dispositive because, according to him, "the Court's interpretation of the term 'mineral' in the SRHA included the requirement that the material be valuable." *Post*, at 190–191 (dissenting opinion). That is not quite correct. *Western Nuclear* defined "minerals," in part, as substances "that can be used for commercial purposes" and that "have separate value" from the soil. 462 U. S., at 53–54. However, as the remainder of our opinion explains, the minimal inquiry into whether a substance might at some point have separate value from the soil and might, in the abstract, be susceptible of commercial use is a far different inquiry from whether the substance is a "valuable mineral" as Congress used the term in 1919.

to include sand and gravel in the Pittman Act's mineral reservation.

"In interpreting statutory mineral reservations like the one at issue here, we have emphasized that Congress 'was dealing with a practical subject in a practical way' and that it intended the terms of the reservation to be understood in 'their ordinary and popular sense.'" *Amoco Production Co.* v. *Southern Ute Tribe,* 526 U. S. 865, 873 (1999) (quoting *Burke* v. *Southern Pacific R. Co.,* 234 U. S. 669, 679 (1914)). Importantly, the proper inquiry focuses on the ordinary meaning of the reservation at the time Congress enacted it. *Amoco Production Co., supra,* at 874; *Leo Sheep Co.* v. *United States,* 440 U. S. 668, 682 (1979) (land-grant statutes should be interpreted in light of "the condition of the country when the acts were passed" (internal quotation marks omitted)); see also *Perrin* v. *United States,* 444 U. S. 37, 42 (1979) ("[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning" at the time Congress enacted the statute). Because the Pittman Act applied only to Nevada, the ultimate question is whether the sand and gravel found in Nevada were commonly regarded as "valuable minerals" in 1919.

Common sense tells us, and the Government does not contest, that the answer to that question is an emphatic "No." Sand and gravel were, and are, abundant throughout Nevada; they have no intrinsic value; and they were commercially worthless in 1919 due to Nevada's sparse population and lack of development.[6] Thus, even if Nevada's sand and gravel were regarded as minerals, no one would have mistaken them for *valuable* minerals. The Government argues only that sand and gravel were commercially marketable in other parts of the United States during World War I and that there is now a market for sand and gravel in some parts of Nevada. As we have explained, this evidence is simply

---

[6] Indeed, as petitioners aptly point out, "[e]ven the most enterprising settler could not have sold sand in the desert." Brief for Petitioners 6.

irrelevant to the proper inquiry into the meaning of the statutory mineral reservation. Cf. *Amoco Production Co.*, 526 U. S., at 873–880 (relying on the popular meaning of "coal" in 1909 and 1910 to hold that a reservation of "coal" does not include coalbed methane gas). Because we readily conclude that the "most natural interpretation" of the mineral reservation does not encompass sand and gravel, we "need not consider the applicability of the canon that ambiguities in land grants are construed in favor of the sovereign." *Id.*, at 880.

The statutory context of the Pittman Act's mineral reservation further confirms its ordinary meaning. The sentence directly following the reservation provides that the reserved "valuable mineral deposits . . . shall be subject to disposal by the United States in accordance with the provisions of the . . . mineral land laws in force at the time of such disposal." § 8, 41 Stat. 295. Here, Congress was explicitly cross-referencing the General Mining Act of 1872, currently codified at Rev. Stat. § 2319, 30 U. S. C. § 22. Then, as now, the General Mining Act provided that "all valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase . . . under regulations prescribed by law." *Ibid.* We can therefore infer that the reserved "valuable minerals" in Pittman Act lands were the same class of minerals that could be located and disposed of under the General Mining Act. Cf. *Western Nuclear*, 462 U. S., at 59 (drawing same inference from nearly identical mineral reservation).

It is beyond dispute that when the Pittman Act became law in 1919, common sand and gravel could not constitute a locatable "valuable mineral deposit" under the General Mining Act. The Secretary of the Interior had held as much in *Zimmerman* v. *Brunson*, 39 L. D. 310 (1910), see *Western Nuclear, supra*, at 45 (discussing *Zimmerman*); 462 U. S., at 63–65 (Powell, J., dissenting) (same), and this remained the Department's position until 1929, when it overruled *Zimmer-*

*man* in *Layman* v. *Ellis,* 52 L. D. 714, see, *e. g., Western Nuclear, supra,* at 65–69 (Powell, J., dissenting); *Robert L. Beery,* 83 I. D. 249, 253 (1976) ("Prior to 1929 sand and gravel were not considered locatable under the general mining law").[7] Thus, in the unlikely event that some ambitious prospector had sought a patent from the United States in 1919 to extract sand and gravel from Pittman Act lands, the Secretary of the Interior would have flatly refused him.

The Government is correct that the *Western Nuclear* Court sidestepped the impact of this line of reasoning by relying on the ambiguity of the term "minerals" and the possibility that Congress was not aware of Interior's *Zimmerman* decision, see 462 U. S., at 45–47. But we decline to extend that approach beyond the SRHA. In our analysis, the statutory structure of the Pittman Act convincingly reinforces the unambiguous meaning of the term "valuable minerals."

Notwithstanding the contemporaneous plain meaning of the Pittman Act's mineral reservation, the Government argues that the Act's legislative history counsels us to give "valuable minerals" precisely the same meaning we ascribed to "minerals" in *Western Nuclear.* Because we have held that the text of the statutory reservation clearly excludes sand and gravel, we have no occasion to resort to legislative history. See, *e. g., Lamie,* 540 U. S., at 534, 536; *Hartford Underwriters,* 530 U. S., at 6; *Hughes Aircraft Co.,* 525 U. S., at 438; *Connecticut Nat. Bank,* 503 U. S., at 254. Having declined to extend *Western Nuclear*'s rationale to a statute where the plain meaning will not support it, we will not allow it in through the back door by presuming that "the legislature was ignorant of the meaning of the language

---

[7] Congress restored the *Zimmerman* rule in 1955 when it enacted the Surface Resources Act, §3, 69 Stat. 368, 30 U. S. C. §611 ("No deposit of common varieties of sand [and] gravel . . . shall be deemed a valuable mineral deposit within the meaning of the mining laws of the United States . . .").

it employed." *Montclair* v. *Ramsdell,* 107 U. S. 147, 152 (1883).[8]

The judgment of the United States Court of Appeals for the Ninth Circuit is therefore reversed, and the case is remanded for further proceedings.

*It is so ordered.*

JUSTICE THOMAS, with whom JUSTICE BREYER joins, concurring in the judgment.

I agree with JUSTICE STEVENS that the mineral reservation provision in the Pittman Underground Water Act of 1919 (Pittman Act or Act) cannot be meaningfully distinguished from the analogous provision in the Stock-Raising Homestead Act of 1916 (SRHA). As JUSTICE STEVENS points out, the term "minerals" in the Pittman Act provision is only twice modified by the adjective "valuable," which "suggest[s] that the terms 'valuable minerals' and 'minerals' were intended to be synonymous." *Post,* at 191 (dissenting

---

[8] While JUSTICE STEVENS does not contest the plain meaning of the Pittman Act's mineral reservation, he nonetheless takes us to task for "refusing to examine" the legislative history proffered by the Government and thereby engaging in a "deliberately uninformed" and "unconstrained" method of statutory interpretation. *Post,* at 190–192. Of course, accepting JUSTICE STEVENS' approach would require a radical abandonment of our longstanding precedents that permit resort to legislative history only when necessary to interpret ambiguous statutory text. Chief Justice Marshall in 1805 stated the principle that definitively resolves this case nearly 200 years later: "Where a law is plain and unambiguous, whether it be expressed in general or limited terms, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction." *United States* v. *Fisher,* 2 Cranch 358, 399. We thus cannot accept JUSTICE STEVENS' invitation to presume that Congress expressed itself in a single House Committee Report rather than in the unambiguous statutory text approved by both Houses and signed by the President. We fail to see, moreover, how a court exercises unconstrained discretion when it carries out its "sole function" with respect to an unambiguous statute, namely, to "enforce it according to its terms." *Caminetti* v. *United States,* 242 U. S. 470, 485 (1917).

opinion). I concur in the judgment, however, because I believe that mineral reservations pursuant to both the Pittman Act and the SRHA do not include sand and gravel.

To reach its result without reconsidering *Watt* v. *Western Nuclear, Inc.*, 462 U. S. 36 (1983), the plurality relies heavily on the Pittman Act's use of the term "valuable minerals," contrasting this with the SRHA's use of the term "minerals." This difference, the plurality holds, makes the scope of the Pittman Act's mineral reservation provision both more clear and more narrow than that of the SRHA. See *ante,* at 183. Placing so much emphasis on the modifier "valuable" in the Pittman Act, however, ignores the fact that the Act uses the terms "valuable minerals" and "minerals" interchangeably. It also implies that the Court erred in *Western Nuclear*, not by interpreting the term "minerals" too broadly to include sand and gravel (as the plurality suggests here, see *ante,* at 183), but by interpreting "minerals" too narrowly by reading into the term a requirement that the minerals can be used for commercial purposes.* If the word "valuable" were the textual source of a commercial purpose requirement, then the SRHA's lack of that modifier would strongly imply that the SRHA contains no commercial purpose requirement. Because the Court in *Western Nuclear* properly interpreted the term "minerals" to contain a commercial purpose requirement, I would not put so much emphasis on the modifier "valuable."

I disagree, however, with the Court's conclusion in *Western Nuclear* that sand and gravel are "minerals" under the

---

*Indeed, the Court in *Western Nuclear* at times suggested an even narrower definition of "mineral," stating that "Congress plainly contemplated that mineral deposits on SRHA lands would be subject to location under the mining laws." 462 U. S., at 51. Those laws allowed individuals "to locate claims to federal land containing *'valuable mineral deposits.'"* *Id.,* at 50–51 (emphasis added). Hence, even minerals indisputably considered "valuable" might fall outside a mineral reservation under the SRHA if the *deposit* itself was not substantial enough to be "valuable."

SRHA merely because, hypothetically, at the time of the passage of the SRHA, they *could* have been used for commercial purposes, 462 U. S., at 55. Because the SRHA and the Pittman Act should be construed similarly, the plurality's reasoning with respect to the Pittman Act cannot be confined to that Act and naturally carries over to the SRHA. As the plurality points out, both common sense and the "statutory context" of the Pittman Act's enactment confirm the view that sand and gravel are not included within the Pittman Act's mineral reservations, since sand and gravel were not understood to be "valuable minerals" at the time of the passage of the Act. See *ante*, at 184–185. Likewise, sand and gravel, with respect to SRHA lands, were not considered to be susceptible of commercial use at the time Congress passed the SRHA.

Although the Court in *Western Nuclear* incorrectly applied its definition of "minerals" to include sand and gravel, the Court is typically reluctant to overrule decisions involving statute interpretation because *"stare decisis* concerns are at their acme in cases involving property and contract rights." *State Oil Co.* v. *Khan,* 522 U. S. 3, 20 (1997). Because the Government identifies significant reliance interests that would be upset by overruling *Western Nuclear,* I do not advocate doing so. The Pittman Act, however, involves substantially less land than the SRHA, and the Government does not identify any significant reliance interests that would be unsettled by our failing to extend *Western Nuclear's* reasoning. I would therefore reverse the judgment of the Court of Appeals and decline to extend *Western Nuclear's* faulty reasoning beyond the SRHA.

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, dissenting.

The Stock-Raising Homestead Act of 1916 (SRHA or Act) authorized the settlement of homesteads on "lands the surface of which" was "chiefly valuable for grazing and raising

forage crops" and "not susceptible of irrigation from any known source of water supply." 43 U. S. C. § 292 (1976 ed.). Congress included in the statute "a reservation to the United States of all the coal and other minerals in the lands . . . entered and patented" under the Act. 43 U. S. C. § 299 (2000 ed.). Two decades ago, in a closely divided decision, we held that gravel found on lands patented under the Act is a mineral reserved to the United States. *Watt* v. *Western Nuclear, Inc.*, 462 U. S. 36, 55 (1983).

The Pittman Underground Water Act of 1919 (Pittman Act), 41 Stat. 293, enacted just three years after the SRHA, was designed to encourage the reclamation of lands in the State of Nevada that were "not known to be susceptible of successful irrigation at a reasonable cost from any known source of water supply." H. R. Rep. No. 286, 66th Cong., 1st Sess., 1 (1919). Today the Court decides that the reservation of minerals in § 8 of the Pittman Act does not include gravel. I think it highly unlikely that Congress would reserve its ownership of sand and gravel in the millions of acres of land in the West that were covered by the SRHA and not do so for the land in Nevada covered by the Pittman Act. Indeed, the House Committee Report describing the scope of the mineral reservation in § 8 of the Pittman Act plainly states: "Section 8 of the bill contains the same reservations of minerals, with the facility for prospecting for and developing and mining such minerals as was provided in the [SRHA]." *Ibid.* A clearer expression of Congress' intent would be hard to find.

The plurality opinion rests entirely on the textual difference between the SRHA's reservation of " 'all the coal and other minerals' " and the Pittman Act's reservation of " 'all the coal and other *valuable* minerals.' " *Ante*, at 181. But that holding ignores the fact that in *Western Nuclear* the Court's interpretation of the term "mineral" in the SRHA.

included the requirement that the material be valuable.* Moreover, the term "mineral" or "minerals" appears eight times in § 8 of the Pittman Act, and only twice is it modified by the adjective "valuable," strongly suggesting that the terms "valuable minerals" and "minerals" were intended to be synonymous. Thus, the text of § 8 and its legislative history, as well as·both the reasoning and the result in *Western Nuclear*, all support the conclusion that Congress intended the mineral reservation in these two statutes to be the same. The single word "valuable," in short, cannot support the weight THE CHIEF JUSTICE places on it.

As a matter of public policy, there is no reason why Congress would enact a broader reservation in either statute. The policy of including sand and gravel in the reservation may well be unwise, and, indeed, the majority in *Western Nuclear* may have misinterpreted Congress' intent in 1916.

---

*"Given Congress' understanding that the surface of SRHA lands would be used for ranching and farming, we interpret the mineral reservation in the Act to include substances that are mineral in character (*i. e.*, that are inorganic), that can be removed from the soil, that can be used for commercial purposes, and that there is no reason to suppose were intended to be included in the surface estate. See 1 American Law of Mining § 3.26 [(1982)] ('A reservation of minerals should be considered to sever from the surface all mineral substances which can be taken from the soil and which have a separate value'). Cf. *Northern Pacific R. Co.* v. *Soderberg*, 188 U. S. [526, 536–537 (1903)] ('mineral lands include not merely metalliferous lands, but all such as are chiefly valuable for their deposits of a mineral character, which are useful in the arts or valuable for purposes of manufacture'); *United States* v. *Isbell Construction Co.*, [78 I. D. 385, 390 (1971)] ('the reservation of minerals should be considered to sever from the surface all mineral substances *which can be taken from the soil and have a separate value*') (emphasis in original). This interpretation of the mineral reservation best serves the congressional purpose of encouraging the concurrent development of both surface and subsurface resources, for ranching and farming do not ordinarily entail the extraction of mineral substances that can be taken from the soil and that have separate value." *Western Nuclear*, 462 U. S., at 53–54.

Neither of those possibilities, however, provides an adequate justification for substituting the plurality's appraisal today of Congress' judgment for the view that prevailed in a decision that has been settled law for two decades. This conclusion is fortified by the well-recognized "need for certainty and predictability where land titles are concerned." *Leo Sheep Co.* v. *United States,* 440 U. S. 668, 687 (1979).

In refusing to examine the legislative history that provides a clear answer to the question whether Congress intended the scope of the mineral reservations in these two statutes to be identical, the plurality abandons one of the most valuable tools of judicial decisionmaking. As Justice Aharon Barak of the Israel Supreme Court perceptively has explained, the "minimalist" judge "who holds that the purpose of the statute may be learned only from its language" retains greater discretion than the judge who "will seek guidance from every reliable source." Judicial Discretion 62 (Y. Kaufmann transl. 1989). A method of statutory interpretation that is deliberately uninformed, and hence unconstrained, increases the risk that the judge's own policy preferences will affect the decisional process. The policy choice at issue in this case is surely one that should be made either by Congress itself or by the executive agency administering the Pittman Act. Congress' acceptance of the holding in *Western Nuclear* for the past two decades should control our decision, and any residual doubt should be eliminated by the deference owed to the executive agency that has consistently construed the mineral reservations in land-grant statutes as including sand and gravel. See 462 U. S., at 56–57 (citing rulings of the Department of the Interior).

Accordingly, I respectfully dissent.