In re Bennie **CLEMONS, Jr.,** and Michelle Burton Clemons, Debtors.

No. 05–85163.

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

June 1, 2006.

E.L. Clark, Clark & Washington, P.C., Atlanta, GA, for Debtors.

### ORDER DENYING OBJECTION TO CONFIRMATION

JAMES E. MASSEY, Bankruptcy Judge.

The issue presented in this Chapter 13 case is whether section 1325(b) of the Bankruptcy Code requires a debtor to make payments to the trustee with respect to income that the debtor had prior to filing bankruptcy notwithstanding that the debtor receives less income postpetition so that making such payments is in fact impossible. Section 1325(b) was extensively amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Those amendments apply in this case, and the issue presented is one of first impression in this district.

Bennie Clemons, Jr. and Michelle Burton Clemons filed this Chapter 13 case on October 31, 2005. On November 16, 2005, they filed Official Bankruptcy Form B22C (Statement of Current Monthly Income And Calculation of Commitment Period and Disposable Income) in which they reported that Mr. Clemons earned an average of $4,983 per month and Mrs. Clemons earned an average of $1,997 per month during the six month period preceding the petition date. They also stated these amounts as their respective incomes on Schedule I. In the initial draft of their plan, they proposed to make monthly payments of $420 to the Chapter 13 Trustee. On December 22, 2005, the Trustee objected to confirmation of that plan on various grounds.

Debtors subsequently amended Schedule I to show that Mrs. Clemons had no income and amended their plan. The current plan, titled "Debtors' Third Amended Chapter 13 Plan," proposes a monthly plan payment of $213 with a payout of 1% of allowed unsecured claims, several of which have been filed.

In response to the lower proposed plan payment, the Chapter 13 Trustee added a new objection to confirmation based on section 1325(b) of the Bankruptcy Code.

Section 1325(b) provides in relevant part:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court

may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

(2) for purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—

(A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed[.]

. . .

(3) Amounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than—

. . .

(B) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals[.]

. . .

11 U.S.C.A. § 1325(b). The Trustee contends that Debtors' projected disposable income must be based on the income earned by them during the six month period preceding the filing of the case because the definition of the term "disposable income" is based on "current monthly income," another term defined in the Bankruptcy Code.

Section 101(10A) of the Bankruptcy Code states in relevant part that:

The term "current monthly income"—

(A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6–month period ending on—

(i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or

(ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii)[.]

11 U.S.C. § 101(10A).

The Trustee points out that on Official Bankruptcy Form B22C, Debtors reported combined average monthly income of $6,980 for the six months preceding the filing and computed their disposable income to be $432.28 per month, which would be sufficient to pay unsecured debt in full. She contends that section 1325(b) requires the plan to provide for payment of this amount to unsecured creditors each month as a condition to confirmation. Because the plan does not provide for the payment of $432 per month to unsecured creditors, she asserts the Court should deny confirmation and dismiss the case.

Debtors counter that current monthly income is a "presumptive amount" that can be rebutted, pursuant to 11 U.S.C. § 707(b)(2)(B), by a showing of "special circumstances" and that the inability of Mrs. Clemons, who had been earning $1,997 per month for over two and a half years, to obtain employment since losing her job on December 30, 2005, qualifies as "special circumstances."

■■■■ Thus, this dispute requires the Court to determine the meaning of section 1325(b).

In construing a statute, "[t]he preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, 124 S.Ct. 1587, 1593, 158 L.Ed.2d 338 (2004) (second alteration in original) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992)). This inquiry requires the court to "begin[ ] with the statutory text, and end[ ] there as well if the text is unambiguous." *Id.* Furthermore, words are given their ordinary, plain meaning unless defined otherwise. *Id.* at 183, 124 S.Ct. at 1593–94; see also *In re Paschen*, 296 F.3d 1203, 1207 (11th Cir.2002).

*American Bankers Ins. Group v. U.S.*, 408 F.3d 1328, 1332 (11th Cir.2005). In deciding whether a section of a statute has a plain meaning, however, a court " 'must not be guided by a single sentence or member of a sentence, but [must] look to the provisions of the whole law, and to its object and policy.'" *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 221, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (quoting *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 285, 76 S.Ct. 349, 100 L.Ed. 309 (1956), which quotes *United States v.*

*Heirs of Boisdore*, 8 How. 113, 122, 12 L.Ed. 1009 (1849)).

■■■■ "[W]hen Congress' words admit of more than one reasonable interpretation, 'plain meaning' becomes an impossible dream, and an inquiring court must look to the policies, principles and purposes underlying the statute in order to construe it. Congress, after all, does not legislate in a vacuum." *Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. # 1 (In re Thinking Machs. Corp.)*, 67 F.3d 1021, 1025 (1st Cir.1995) (citations omitted).

If the portions of the definitions of "disposable income" (in section 1325(b)(2)) and "current monthly income" (in section 101(10A)(i)) relevant to this case are substituted for those terms in section 1325(b)(1)(B), section 1325(b)(1)(B) would essentially read as follows (with the definitions displayed in italics):

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

. . .

(B) the plan provides that all of the debtor's projected *average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) . . . derived during the 6–month period ending on* [the last day of the month preceding the month during which the petition is filed if debtor files the schedule of current income] *received by the debtor . . .* to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan [less necessary permitted expenses].

This is very convoluted and confusing language: "average monthly income that the debtor receives ... received by the debtor ... to be received during the applicable commitment period." But is it ambiguous? The section might be read to support the Trustee's position if the word "projected" means merely the mechanical projection of past income into the future pay periods, if the phrase "to be received" in subparagraph (b)(1)(B) is read with the word "projected" not to mean actually received but rather as a hypothetical projection into future periods comprising the term of the plan, and if the phrase "received by the debtor" in subparagraph (b)(2) is read to refer to the average amount of income received that was derived in the prepetition period defined in section 101(10A)(i).

These phrases containing the word "received," together with the word "projected," may, however, convey an entirely different meaning. That alternative meaning is that the current monthly income relevant to computing disposable income in making the calculations required by section 1325(b) is the current monthly income that the court projects the debtor will actually receive. If funds are not "received," they are not income.

■ This latter interpretation has the decided advantage of preventing the word "projected" and the two phrases containing the word "received" from being redundant, if not superfluous. Under the interpretation espoused by the Trustee, the words "projected," "received" and "to be received" could be omitted without changing the meaning of that section because under that interpretation, current monthly income is a fixed number that does not change even if such income is not actually received. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' *Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) (internal quotation marks omitted)[.]" *TRW Inc. v. Andrews,* 534 U.S. 19, 31, 122 S.Ct. 441, 449, 151 L.Ed.2d 339 (2001). The Trustee's reading of section 1325(b) makes the word "projected" and the phrases containing the word "received" superfluous.

There is already some support for rejecting the Trustee's argument. *See In re Jass,* 340 B.R. 411, 415 (Bankr.D.Utah 2006) ("The Court must give meaning to the word 'projected,' as it obviously has independent significance."); *In re Hardacre,* 338 B.R. 718, 723 (Bankr.N.D.Tex. 2006) (stating that Congress must have intended "projected disposable income" used in § 1325(b)(1)(B) to be different from "disposable income" defined in § 1325(b)(2)).

To discern Congressional intent in enacting section 1325(b), it is not enough, in light of the ambiguity this section presents, to focus on its words alone. The U.S. Supreme Court has instead insisted on a holistic approach to statutory interpretation:

> Over and over we have stressed that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States v. Heirs of Boisdore,* 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849) (quoted in more than a dozen cases, most recently *Dole v. Steelworkers,* 494 U.S. 26, 35, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990)).

*U.S. Nat. Bank of Oregon v. Independent Ins. Agents of America, Inc.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993).

Apart from the emphasis on projected income to be received, the place to start is

section 101(10A)'s definition of "current monthly income" and specifically with the fact that there are actually two definitions: one in subpart (i), which looks back at historical income, and the other in subpart (ii), triggered by the debtor's failure to file a "statement of *current* income required by section 521(a)(1)(B)(ii)." (Emphasis added.) If the statement of "current income" is missing, the court determines "current monthly income" for the six-month period ending on the date of the determination, thereby necessarily taking into account a debtor's postpetition income. These definitions of CMI in section 101(10A) strongly suggest that Congress intended that to use prepetition income as a starting point in ensuring that all of a debtor's actual current income is accounted for.

The term "current monthly income" is used in section 707(b) of the Bankruptcy Code in connection with the arithmetical determination of whether a debtor's net income is high enough to give rise to a presumption of abuse of Chapter 7. In that section, Congress did not embrace the notion that CMI based on prepetition income was the immutable benchmark. Instead, it provided that a debtor may rebut a presumption of abuse by "demonstrating special circumstances" warranting "adjustments of current monthly income for which there is no reasonable alternative." The ability to adjust CMI upon a showing of "special circumstances" is an essential part of the "means test" that acts as the gatekeeper to Chapter 7. If a Chapter 7 debtor's CMI exceeds the applicable Median Income, that debtor will be presumed to have filed the Chapter 7 case in bad faith, 11 U.S.C. § 707(b), which will likely lead to dismissal of the case, unless it is converted to a case under another chapter. Congress thus recognized that it would be senseless to bar a debtor lacking any reasonable prospect in the near term to repay debt from obtaining a discharge merely because that debtor once had a higher income.

The absence of statutory language in Chapter 13 similar to that in section 707(b) providing for the adjustment of CMI where there are special circumstances may or may not have been a drafting oversight. Senator Feingold, apparently viewing the failure to include such a provision in Chapter 13 as an error, proposed two amendments, Senate Amendments 96 and 97, to fix this problem. In the Congressional Record he stated as follows:

> Incidentally, the bill already provides a safety valve for calculating current monthly income in chapter 7. The court can reduce the income used for the means test if special circumstances are present. Special circumstances such as job loss or a sharp reduction in income from a home business would certainly qualify. I think it is an oversight that this was not done for chapter 13. So I hope the sponsors will simply fix this problem.

151 Cong. Rec. S2315 (daily ed. March 9, 2005). Both amendments were withdrawn, however. 151 Cong. Rec. S2463 (daily ed. March 10, 2005) (withdrawing Senate Amendment 96); 151 Cong. Rec. S2342 (daily ed. March 9, 2005) (withdrawing Senate Amendment 97). The withdrawal of the proposed amendments has no bearing on the meaning of section 1325(b).

The Chapter 13 Trustee's interpretation of section 1325(b) is that Congress did not provide such a safety valve in Chapter 13. The Court agrees that the authority to adjust CMI in a Chapter 7 case is not, as Debtors argue, directly applicable to a Chapter 13 case. But section 1325(b)(2) itself is the comparable counterpart to section 707(b)(2) in Chapter 13 because it looks to income "to be re-

ceived" in order to determine "projected" disposable income.

Furthermore, barring Debtors from Chapter 13 would not serve any policy underlying the Bankruptcy Code in general or the BAPCPA amendments in particular. The primary purpose of the BAPCPA amendments to the consumer provisions of the Bankruptcy Code is to force debtors who can pay a portion of their debts to do so by barring the door to Chapter 7. See 11 U.S.C. §§ 707(b) and 1301, et. seq. If a debtor is unable to pay unsecured creditors even the modest sum of $100 per month, the debtor may discharge all such debts in a Chapter 7 case. Enabling the bankruptcy court to determine projected disposable income, either by determining what a debtor is likely to receive, using CMI as the starting point, or by determining CMI in the first instance, insures that a Chapter 7 debtor pays what that debtor is able to pay without penalizing the debtor who is unlucky enough to have a lower income after filing than before. There is no question that if this case proceeded under Chapter 7, the Court could adjust the Clemonses' income to account for the special circumstance of a job loss.

Given that the Chapter 7 door is open to the Clemonses in which they would pay nothing to unsecured creditors, what possible rationale would explain interpreting section 1325(b) to mean that the door to Chapter 13 is closed to them because they cannot make payments on unsecured debt? The Court cannot come up with a reasonable basis on which Congress could have decided to wall off Chapter 13 from debtors who lose a job just as they file bankruptcy but open the Chapter 13 doors wide to debtors who were unemployed during the six month period just prior to bankruptcy but who are otherwise in precisely the same financial condition. Indeed, under the Trustee's interpretation of section 1325(b), Chapter 13 would be closed only to those debtors who, after losing a job, are unable to wait six months to file bankruptcy.

Most debtors need automobiles to get to work. Maintaining home ownership may be cheaper than renting in many localities and is conducive to maintaining a healthy family life. Home ownership and job preservation are social goals to which Congress has been committed for decades in numerous statutes. Barring the use of Chapter 13 by debtors who lose their jobs just prior to bankruptcy and thereby exposing them to job or home loss would defeat these policies but would do nothing to further the policy of making debtors pay debts if they are able to do so.

In summary, the Court holds that section 1325(b) permits a bankruptcy court to adjust CMI to approximate the income a debtor will receive during the plan term in order to better insure that a debtor pays what the debtor is able to pay but is not required to pay what is impossible to pay.

Based on this analysis, it is

ORDERED that the Trustee's objection to confirmation based on section 1325(b) and the facts found in this Order is DENIED. This Order does not resolve other objections to confirmation, if any still exist. Not does it preclude the Trustee from seeking an evidentiary hearing on whether Mrs. Clemons' inability to find new employment is temporary such that she will have income with which to fund a plan or whether Mr. Clemons' income will be the only income they are likely to have.