MARTIN, Circuit Judge,
dissenting:
The Uniformed Services Employment and Reemployment Rights Act of 1994 (“USERRA”) carries on a long tradition, reflected in our laws, of protecting the rights of “those who left private life to serve their country in its hour of great need.” Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946). I read the majority’s analysis to impede that tradition, and in my view, it does so based on two mistakes. First, the majority interprets 38 U.S.C. § 4302(b) in a way that is not consistent with the statute’s plain text. Second, the majority gives the defendants more .than they asked for — a second chance to apply contract terms that admittedly violate USERRA. In both ways, the majority weakens the rights of veterans based on a statute intended to give them strength. I respectfully dissent.
I.
The majority interprets § 4302(b) as invalidating only the pieces of an agreement that violate USERRA, rather than the whole agreement. After briefly consulting the statutory text, the majority discusses *1329 policy goals to arrive at what it calls “the most reasonable reading” of § 4302(b). But where the text of the statute is not ambiguous, we have no call to substitute what we think might be a more reasonable reading of a statute — rather, “we must apply the statute according to its terms.” Carcieri v. Salazar, 555 U.S. 379, 387, 129 S.Ct. 1058, 1063-64, 172 L.Ed.2d 791 (2009). The majority did not do that here.
A. The Statutory Text
“[0]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous.” BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183, 124 S.Ct. 1587, 1593, 158 L.Ed.2d 338 (2004) (plurality). Section 4302(b) reads as follows:
This chapter supersedes any State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit.
38 U.S.C. § 4302(b) (emphasis added). By its plain language, the statute supersedes “any ... contract [or] agreement,” not merely the illegal pieces of a contract or agreement, as the majority says. Id. (emphasis added). Nowhere does the statute include the limitation found by the majority. Everything listed in § 4302(b) (“law ..., contract, agreement, policy, plan, practice, or other matter”) is a whole, not a piece of a larger whole (for example, “contract provision” or “term of agreement”).[1] We must assume that Congress says in a statute what it means and means in a statute what it says. BedRoc Ltd., LLC, 541 U.S. at 183, 124 S.Ct. at 1593.
We know that Congress can target pieces of a contract in a non-waiver statute, when that is what it intends. Twenty years before USERRA was enacted, Congress included a non-waiver provision that targeted pieces of a contract in the National Mobile Home Construction and Safety Standards Act of 1974, Pub. L. No. 93-383, 88 Stat. 633 (codified as amended at 42 U.S.C. § 5401 et seq. (2012)). There, Congress limited the effect of the statute’s non-waiver provision to “any provision of a contract or agreement” that purported to limit the rights of mobile home purchasers under the Act. 42 U.S.C. § 5421 (emphasis added). Despite knowing how to limit the scope of a non-waiver provision, Congress chose not to in USERRA, and we should understand that choice as deliberate. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S.-,-, 133 S.Ct. 2517, 2529, 186 L.Ed.2d 503 (2013). Congress plainly said the statute supersedes “contract[s]” and “agreement^]” that reduce USERRA rights.[2]
I read the text of § 4302(b) to be unambiguous, so our inquiry should end there. The majority, on the other hand, appears to view § 4302(b) as ambiguous based on different dictionary definitions of the word *1330 “supersede.”[3] Specifically, the majority reasons that because “supersede” is defined as “replacing one thing with another,” § 4302(b) cannot mean what it says without “leav[ing] critical gaps in the employer-employee relationship.” Instead, the majority reasons that Congress must have intended for § 4302(b) to preempt only the pieces of a contract or agreement that violate USERRA. But the Supreme Court has cautioned that we should “decline to manufacture ambiguity where none exists.” United States v. Culbert, 435 U.S. 371, 379, 98 S.Ct. 1112, 1116, 55 L.Ed.2d 349 (1978). Section 4302(b)’s use of the word “supersede” does not render the statute ambiguous so as to allow for speculation about Congress’s desired (but not expressed) intent.
I am not persuaded by the majority’s explanation about why “supersede” cannot be read to mean the entire illegal contract or agreement is replaced with USERRA provisions. The majority mentions “critical gaps” this reading would leave in the employment relationship, but it does not specify what those gaps are or how they would harm veterans’ USERRA rights.[4] Something as fundamental as pay can serve as an example. Even if an illegal employment contract contained pay terms that were superseded along with the rest of the contract under my reading of § 4302(b), there are other ways to ascertain what pay the veteran is entitled to. See, e.g., 20 C.F.R. § 1002.193(a) (noting that sources of pay information under USERRA “include agreements, policies, and practices in effect at the beginning of the employee’s service”); id. § 1002.236(a) (noting that predicted pay raises under USERRA may be ascertained from the “employee’s own work history ... and the work and pay history of employees in the same or similar position”). With this in mind, I am not able to see what “critical gaps” would impair a veteran’s rights under a plain-language reading of § 4302(b).
My reading of § 4302(b) is supported by a neighboring provision, 38 U.S.C. § 4302(a), which saves any “more beneficial” rights provided to a veteran in a contract from being superseded by USER-RA. Section 4302(a) is a savings clause that stops USERRA from throwing out contract rights more beneficial to veterans while invalidating the rest of the illegal contract. The majority cites this savings clause to support its interpretation of § 4302(b), but it actually undermines the majority’s position. That’s because the majority’s interpretation of § 4302(b) renders the savings clause superfluous. Specifically, if the majority is right that § 4302(b) does away with only the illegal pieces of a contract, then there will never be any *1331 “more beneficial” contractual rights for § 4302(a) to step in and save. A piece of a contract that is illegal under USERRA cannot be “more beneficial” than USER-RA. Thus, the majority’s interpretation of § 4302(b) leaves no role for its companion clause, § 4302(a). Courts must be “hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law.” Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 837, 108 S.Ct. 2182, 2189, 100 L.Ed.2d 836 (1988).
On the other hand, a plain-language reading of § 4302(b) does leave a role for its companion clause. When an entire contract is superseded under § 4302(b), the savings clause steps in to preserve any “more beneficial” rights granted to the veteran by the contract. This calibrates the scope of § 4302(b) to maximize veterans’ rights under USERRA. Thus, reading § 4302(b) to supersede entire contracts and agreements not only adheres to the unambiguous text, but it also ensures that § 4302(a) continues to work together with § 4302(b). The majority’s interpretation does not.
B. History and Purpose
Though we need not look beyond the unambiguous text of § 4302(b), a review of USERRA’s legislative history and purpose reinforces the plain-language reading. A House report for USERRA stated: “Section 4302(b) would reaffirm a general preemption as to State and local laws and ordinances, as well as to employer practices and agreements, which provide fewer rights or otherwise limit rights provided under [USERRA].” H.R. Rep. No. 103-65, at 20 (1993) (emphasis added). Section 4302(b)’s preemptive effect was thus described as “general” and understood to apply to entire “agreements” with employers, not just certain pieces of those agreements. And the House stressed that “the extensive body of case law” related to the veterans’ rights statutes preceding USER-RA would “remain in full force and effect.” Id. at 19. This includes Fishgold’s command that every provision of a veterans’ rights statute be given “as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits.” 328 U.S. at 285, 66 S.Ct. at 1111. The majority’s narrow, extra-textual reading of § 4302(b) is anything but a liberal construction of USERRA.
It seems to me that USERRA’s purpose of vigorously protecting veterans’ rights is better served by superseding more than just the illegal terms (though not any “more beneficial” terms), because doing so deters employer overreaching. Under the majority’s interpretation of § 4302(b), employers will have nothing to lose by including illegal terms in their contracts — even if a legally learned veteran does recognize the illegal terms as such (hardly a foregone conclusion), the worst that can happen to the employer is delicate removal of only the illegal terms.[5] Here, for example, the defendants will still get to arbitrate Mr. Bodine’s case even though they drafted an arbitration agreement that infringed on his USERRA rights. The employer suffers no penalty for its bad drafting. The majority’s interpretation means that even when employers don’t get the unfair benefit of their illegal terms because employees like Mr. Bodine recognize the terms’ illegality, USERRA will do nothing to dissuade employers from continuing to use those illegal terms in the future. This result surely does not “provide the greatest benefit to our servicemen and women,” as the majority says.
II.
The majority erodes veterans’ rights still further by giving the defendants more *1332 than they asked for. The defendants acknowledge that certain provisions of the arbitration agreement violate USERRA. Even so, the majority opinion gives them an unrequested second chance to apply these admitted illegal contract terms. Specifically, I refer to two illegal terms in the defendants’ arbitration agreement, which the majority calls the “fee term” and the “statute of limitations term.” This fee term states that Mr. Bodine must pay up to $150 in arbitration costs, any fees and costs the arbitrator apportions to him, as well as the costs associated with mandatory mediation. This fee term directly violates USERRA. See 38 U.S.C. § 4323(h)(1) (“No fees or court costs may be charged or taxed against any. person claiming rights under [USERRA].”). The statute of limitations term sets a six-month limitations period for any claim related to Mr. Bodine’s employment contract. The statute of limitations term also directly violates USERRA. See 38 U.S.C. § 4327(b) (“Inapplicability of statutes of limitations — If any person seeks to file a complaint or claim ... alleging a violation of [USERRA], there shall be no limit on the period for filing the complaint or claim.”).
Throughout this case, the defendants have not disputed that these contract terms violate USERRA, and as such they have tried to nullify the terms’ effect. The defendants told the District Court:
[B]ecause [we] will voluntarily waive the [statute of limitations] defense ..., the provision purporting to limit the statute of limitations in the arbitration agreement, as applied, is of no force or effect, and places no substantive limitation on the Plaintiffs USERRA rights.... [We-also] agree to bear any and all costs associated with any arbitration, mediation, or negotiation of this matter.... Therefore, because the Plaintiff is not required to bear any unreasonable fees to arbitrate this matter, there are no substantive restrictions on the Plaintiffs USERRA rights.
The District Court accepted the defendants’ concession that these terms are illegal, as well as the defendants’ willingness to nullify their effect. The court severed the illegal terms on that basis. In arguing before this Court, the defendants asked us to affirm the District Court because it was “authorized to blue-pencil this agreement in a way [so] that it does not ... diminish any rights under USERRA.” So the defendants still don’t dispute that the fee and statute of limitations terms in the arbitration agreement violate USERRA. Indeed the defendants were wise not to dispute this, because these contract terms do clearly violate the statute.
The majority opinion nonetheless reverses the District Court on this ground and gives the defendants another “opportunity to present their arguments regarding the validity of the terms” before an arbitrator. I say the terms’ illegality under USERRA was not disputed before, and cannot seriously be disputed now.[6] Yet the majority opinion reaches out and takes away not just the federal courts’ ability to supersede illegal “contract[s]” or “agreement[s]” (as the statute says), but the courts’ ability to supersede even the clearly illegal pieces of those contracts. This is a bridge too far. Under the majority’s decision today, an employer can insert a boilerplate arbitration agreement into its employment contract — no matter whether that agreement is legal — and federal courts will be essentially divested of authority to enforce USERRA.[7] Surely Con *1333 gress did not intend for federal courts to be so easily and completely deprived of authority to enforce USERRA when an agreement contains blatantly illegal terms. Veterans’ rights statutes preceding US-ERRA stretch back to World War II and “provide[ ] the mechanism for manning the Armed Forces of the United States.” Ala. Power Co. v. Davis, 481 U.S. 581, 588, 97 S.Ct. 2002, 2004, 52 L.Ed.2d 595 (1977); see also Coffman v. Chugach Support Servs., Inc., 411 F.3d 1231, 1235 (11th Cir. 2005) (noting that USERRA and its predecessor statutes were intended to “bolster the morale of those serving their country” (quotation omitted)). Veterans’ rights statutes thus occupy a domain of special national importance, and our courts should not lightly be stripped of the power to enforce them.
Under the majority’s decision, the worst to happen to overreaching employers will be a delicate, removal of just their illegal terms. Veterans, on the other hand, may lose their USERRA rights without redress. Take, for example, a fee term like the one here. A veteran might be forced to pay mandatory mediation and arbitration fees before she can prove (and if she can prove) to an arbitrator that USERRA has been violated.[8] In conjunction with the majority’s narrow, extra-textual interpretation of § 4302(b), its decision to undo the District Court’s severance of the clearly illegal terms walks back veterans’ rights rather than protecting them.
This is an important case about a relatively novel issue. How we resolve it affects not only veterans’ rights, but how employers regard those rights. I read the majority’s interpretation of § 4302(b) to contradict the plain text of the statute in a way that fails to preserve § 4302(a)’s saving effect and could also foster employer overreaching. I worry also that the majority opinion will strip federal courts of not just the power to supersede “contract[s]” or “agreement[s],” but also the power to supersede pieces of contracts acknowledged to be illegal. USERRA is meant to give special protections to our veterans, and the majority opinion dilutes those protections. I respectfully dissent.
APPENDIX
The Contract reads in pertinent part:
VII.
ALTERNATIVE DISPUTE RESOLUTION
THE PARTIES TO THIS AGREEMENT HEREBY EXPRESS THAT, EXCEPT AS SET FORTH BELOW, ALL DISPUTES, CONTROVERSIES OR CLAIMS OF ANY KIND AND NATURE BETWEEN THE PARTIES *1334 HERETO, ARISING OUT OF OR IN ANY WAY RELATED TO THE WITHIN AGREEMENT, ITS INTERPRETATION, PERFORMANCE OR BREACH, SHALL BE RESOLVED EXCLUSIVELY BY THE FOLLOWING ALTERNATE DISPUTE RESOLUTION (“ADR”) MECHANISMS:
A. Negotiation — The parties hereto shall first engage in a good faith effort to negotiate any such controversy. ...
B. Should the above-stated negotiations be unsuccessful, the parties shall engage in mediation....
C. Should the above-stated mediation be unsuccessful, the parties agree to arbitrate any such controversy or claim with the express understanding that this Agreement is affected by interstate commerce.... The arbitration shall be conducted pursuant to the Arbitration Rules of the American Arbitration Association (the “Arbitration Rules”) or such other arbitration rule as the parties may otherwise agree to choose.
D. The Employee shall pay no more than $ 150 in arbitration costs. However, the parties agree that the arbitrator may as part of his final decree reapportion the fees, including attorney’s fees, and costs between the parties as allowed by applicable law.
Notwithstanding any other provision of this Article to the contrary, in the event a party may desire to seek interim relief, whether affirmative or prohibitive, in-the form of a stay or motion to compel arbitration ... such party may initiate the appropriate litigation to obtain such relief (“Equitable Litigation”). Nothing herein.shall be construed to suspend or terminate the obligation of both parties prompt-
ly to proceed with the ADR procedures concerning the subject of such Equitable Litigation while such Equitable Litigation and any appeal therefrom is pending.
To the extent that a court of competent jurisdiction should determine that the provisions of the Federal Arbitration Act are not applicable to this Agreement, the parties hereto nevertheless agree to arbitrate under the provisions of Alabama law, the measure or amount of damages to which either of the parties may be entitled. Such arbitration shall be conducted pursuant to the Arbitration Rules.
The parties intend that this Article VII shall encompass and embody the broadest range of matters that may be arbitrated under federal law. The parties further agree that any question as to the scope of this Article VII shall, to the extent permitted by law, be determined by the arbitrator (including, without limitation, issues of unfairness, capacity, waiver, uncon-scionability and so forth).
VIII.
MISCELLANEOUS
B. Both the Employer and the Employee mutually agree that the covenants and restrictions contained in Article V and Article VI above, or any of their respective subparts, are separate and sever-able, and the unenforceability of any specific covenant shall not affect the validity of any other covenant set forth herein. If any term or provision of this Agreement shall be invalid or unenforceable to any extent or application, then the remainder of this Agreement shall be valid and enforceable to *1335 the fullest extent and the broadest application permitted by law....
D. Neither this Agreement nor any of the terms and provisions hereof, including, -without limitation, the provisions of the preceding Article, may be waived or modified in whole or in part, except by written instrument signed by an officer of the Employer expressly stating that it is intended to operate as a waiver or modification of this Agreement....
G. It is acknowledged by the Employer and the Employee that the place of this contract and its status is in the County of Morgan, State of Alabama. The Employer and the Employee expressly agree that federal law and the laws of the State of Alabama shall govern the validity, construction, interpretation, and effect of this Agreement, or any provision thereof.

. Rather than using limiting language, Congress used the all-inclusive word "any” six times in § 4302(b). This emphasizes the statute’s broad scope.

. To the extent the majority interprets § 4302(b) the way it does out of worry about creating a conflict between USERRA and the FAA, this fear is unfounded. If § 4302(b) means what it says, the arbitration agreement at issue in this case is void. Without an arbitration agreement, the FAA is irrelevant. See Breletic v. CACI, Inc.-Fed., 413 F.Supp.2d 1329, 1337 (N.D. Ga. 2006). And there is no reason to treat arbitration agreements differently from any other "contract [or] agreement” that would be superseded by § 4302(b) because, as the majority points out, the FAA places arbitration agreements on an equal footing with all other contracts. The FAA neither elevates arbitration agreements to a special status nor removes them from the reach of the law.

. In fairness, the majority never says that § 4302(b) is ambiguous, but its interpretation looks past the plain text in favor of accomplishing congressional intent and policy goals. For that reason, I understand the majority to see § 4302(b) as ambiguous. Cf. Conn. Nat'l Bank v. Germain, 503 U.S. 249, 254, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.” (quotation omitted)). If the majority thought § 4302(b) unambiguously superseded only the illegal pieces of a contract, the opinion would presumably point to where the statute says that. It does not.

. Neither does the majority address the possibility of superseding just the arbitration agreement within the employment contract. Both of the illegal contract terms here are contained within a separately delineated arbitration agreement. And the Supreme Court has applied USERRA’s predecessor statutes to preempt separate agreements within contracts. See, e.g., McKinney v. Mo.-Kan.-Tex. R.R. Co., 357 U.S. 265, 268-70, 78 S.Ct. . 1222, 1225-26, 2 L.Ed.2d 1305 (1958) (allowing a veteran to avoid a grievance agreement contained within his collective bargaining contract, but not invalidating the collective bargaining contract).

. And as will be discussed in Part II, the majority casts even that result into doubt.

. Maybe the majority understands the defendants' sudden use of "purportedly” whenever they mention the terms' illegality in their appellate brief to mean that the issue is disputed. I don’t think this wordsmithing changes the concessions the defendants made to the District Court, which that court relied on.

. While the arbitrator's decision could conceivably come before the courts on a motion *1333 to vacate, see 9 U.S.C. § 10, "courts may vacate an arbitrator’s decision only in very unusual circumstances,” Oxford Health Plans LLC v. Sutter, 569 U.S.-,-, 133 S.Ct. 2064, 2068, 186 L.Ed.2d 113 (2013) (quotation omitted). These very unusual circumstances do not include the arbitrator's commission of “error — or even a serious error.” Id. (quotation omitted). Instead, motions to vacate concern things like fraud, corruption, and misconduct. See 9 U.S.C. § 10(a).

. Even if some veterans can eventually prove to an arbitrator that illegal terms violate US-ERRA, damage will have already been done. In McKinney, the Supreme Court expressed concern at the idea that veterans would be delayed in vindicating their rights, and said that delay "might often result in hardship to the veteran and the defeat, for all practical purposes, of the rights' Congress sought to give him.” 357 U.S. at 270, 78 S.Ct. at .1226. The Court said delay would contradict “the liberal procedural policy clearly manifested in the statute for the vindication of [veterans’] rights.” Id.