# United States Court of Appeals
## For the First Circuit

No. 09-1179

HOUNG SAYSANA,

Petitioner, Appellee,

v.

BRIAN H. GILLEN, IN HIS CAPACITY AS SUPERINTENDENT OF
PLYMOUTH COUNTY CORRECTIONAL FACILITY,

Respondent, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Richard Stearns, U.S. District Judge]

Before

Howard, Ripple,* and Selya, Circuit Judges.

Theodore W. Atkinson, Trial Attorney, Office of Immigration
Litigation, with whom Michael F. Hertz, Acting Assistant Attorney
General, Civil Division, David J. Kline, Director, District Court
Section, Office of Immigration Litigation and Gjon Juncaj, Senior
Litigation Counsel, United States Justice Department, were on
brief, for appellant.
Kerry E. Doyle, with whom Graves & Doyle, Jeanette Kain, and
Kaplan, O'Sullivan & Friedman, were on brief, for appellee.

December 22, 2009

* Of the Seventh Circuit, sitting by designation.

**RIPPLE, Circuit Judge.** In 2007, Houng Saysana was taken into custody by Immigration and Customs Enforcement ("ICE") and held without bond. After agency proceedings in which bond was again denied, he filed this petition for habeas corpus in the district court, challenging the conclusion of the Board of Immigration Appeals ("BIA" or "Board") that he is subject to the mandatory detention provision in 8 U.S.C. § 1226(c). The district court concluded that the Board had misinterpreted the statute, and it granted the writ. The Government timely appealed. Because we conclude that the Government has adopted an interpretation contrary to the plain meaning of the statute, we affirm the judgment of the district court. We also hold, in the alternative, that, even if the statute were ambiguous, the position of the Government is not a reasonable one.

## I.  BACKGROUND

### A.  Facts and Agency Proceedings

Mr. Saysana is a native and citizen of Laos who entered the United States as a refugee in 1980. In 1990, he was convicted of indecent assault and battery in Massachusetts state court. He was sentenced to five years' imprisonment, three months of which were served. He was released in 1991.

In 2005, Mr. Saysana again was arrested, this time for failing to register as a sex offender as required by Massachusetts law because of his 1990 offense. The charge later was dismissed,

and Mr. Saysana was released from state custody.

In 2007, ICE took Mr. Saysana into custody pursuant to 8 U.S.C. § 1226(c), and held him without bond. On the same day, the Department of Homeland Security ("DHS") initiated removal proceedings, contending that Mr. Saysana's 1990 conviction qualified as an aggravated felony crime of violence, see 8 U.S.C. § 1101(a)(43)(F), and rendered him removable, see id. § 1227(a)(2)(A)(iii).[1] The IJ held a bond redetermination hearing and ordered Mr. Saysana released on $3500 bond. Mr. Saysana posted the bond.

The DHS appealed the bond decision to the BIA. In its precedent decision, Matter of Saysana, 24 I & N Dec. 602 (BIA 2008), the Board concluded that the mandatory detention provision of 8 U.S.C. § 1226(c) applied to any alien with a qualifying conviction who was "released" from any criminal custody after the effective date of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009, 3009-546 (codified as amended in scattered sections of 8 U.S.C.), here October 8, 1998. See infra note 2. In the Board's view, because Mr. Saysana had been released from state custody in 2005, he was subject to the mandatory detention requirement, even though the charge that formed the basis for his 2005 arrest, failure to

---

[1] 8 U.S.C. § 1227(a)(2)(A)(iii) provides: "Any alien who is convicted of an aggravated felony at any time after admission is deportable."

register as a sex offender, was not the crime that formed the basis for his removal proceedings.  After the BIA reversed the IJ's bond decision, ICE took Mr. Saysana back into custody.  Mr. Saysana then filed a petition for a writ of habeas corpus.

## B.  Opinion of the District Court

The district court concluded that the Board's interpretation of § 1226(c) was erroneous:

> This court does not agree with the Board of Immigration Appeals' (BIA) interpretation of § 1226(c), as applied to petitioner's case.  I find Chief Judge Kane's decision in Thomas v. Hogan, [No. 1:08-CV-0417,] 2008 WL 4793739 (M.D. Pa. Oct. 31, 2008), factually analogous and persuasive.  I adopt her reasoning as to why the mandatory detention provision of IIRIRA does not apply to aliens released from custody in circumstances similar to those of petitioner.

Order of Dec. 1, 2008 at 1-2 (internal citation omitted).  The Thomas decision cited by the court had relied on "a significant body of case law" holding that the Board's position is contrary to the plain meaning of the statute.  2008 WL 4793739, at *4.  The district court in this case therefore granted the writ and remanded to ICE with instructions to hold an individualized bond hearing within ten days.  The Government now appeals, urging us to accept the agency construction of the statute.

- 4 -

## II. DISCUSSION

At the heart of this appeal is an interpretation of the mandatory detention provision set forth at 8 U.S.C. § 1226(c).[2] Section 1226(c), which is not retroactive, see IIRIRA § 303(b)(2) (stating that the 1996 amendments to the detention provisions apply to aliens "released after" the effective date, subject to statutory extensions of time), is part of a provision that addresses the apprehension and detention of aliens. It states, in relevant part:

> § 1226. Apprehension and detention of aliens
>
> (a) Arrest, detention, and release
>
> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) of this section and pending such decision, the Attorney General--
>
> (1) may continue to detain the arrested alien; and
>
> (2) may release the alien on--

---

[2] In 1996, Congress passed IIRIRA. Pub. L. No. 104-28, 110 Stat. 3009-546. IIRIRA contains a mandatory detention provision, § 236(c) of the Immigration and Nationality Act ("INA"), codified at 8 U.S.C. § 1226(c). Implementation of Section 1226(c) was deferred for two years, during which time detention was governed by § 303(b)(3), otherwise known as the Transition Period Custody Rules ("TPCR"). The TPCR provided for individualized bond hearings for some aliens deportable for having committed certain crimes; the immigration judge could set bond after finding that the alien was not a danger to the community and was likely to appear for future proceedings. The TPCR expired on October 8, 1998, and the mandatory detention provision of 8 U.S.C. § 1226(c) became effective.

(A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

(B) conditional parole; but

(3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

. . .

(c) Detention of criminal aliens

(1) Custody

The Attorney General shall take into custody any alien who--

(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

(B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

(C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentence[d] to a term of imprisonment of at least 1 year, or

(D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

```
(2) Release

     The Attorney General may release an alien
     described in paragraph (1) only if the
     Attorney General decides pursuant to section
     3521 of Title 18 that release of the alien
     from custody is necessary to provide
     protection to a witness, a potential witness,
     a person cooperating with an investigation
     into major criminal activity, or an immediate
     family member or close associate of a witness,
     potential witness, or person cooperating with
     such an investigation, and the alien satisfies
     the Attorney General that the alien will not
     pose a danger to the safety of other persons
     or of property and is likely to appear for any
     scheduled proceeding.  A decision relating to
     such release shall take place in accordance
     with a procedure that considers the severity
     of the offense committed by the alien.
```

8 U.S.C. § 1226 (emphasis added).

We must decide whether the mandatory detention provision applies only when an alien is released from a criminal custody the basis for which is one of the offenses listed in § 1226(c)(1)(A)-(D); or, alternatively, whether it applies whenever an alien, previously convicted of an offense that falls within (c)(1)(A)-(D), is released from <u>any</u> criminal custody regardless of the reason for that detention.  Resolution of this issue centers on the "when released" language in § 1226(c).

The BIA adopted the latter interpretation.  It reasoned:

```
     [T]he language of the last sentence of
     [subsection (c)(1)] does not identify the form
     of detention from which an alien must be
     released.  Rather, we have interpreted the
     statute to require that the release be from a
     non-DHS custodial setting.  A reading of the
     statute as a whole does not suggest that
```

- 7 -

Congress intended to further limit the non-DHS custodial setting to criminal custody pursuant to a conviction for a crime rendering an alien removable. Indeed, as we have observed before, under sections [1226(c)(1)(A) and (D)], an alien need not be convicted of any offense in order to be removable as charged and subject to mandatory detention. Requiring that an alien's release from criminal custody be directly tied to the basis for detention under section [1226](c)(1) would therefore be inconsistent with Congress's mandate to take into custody those aliens who are released . . ., yet who may never have been in non-DHS custody because they are inadmissible under the covered grounds set forth in sections [1226](c)(1)(A) and (D). Thus, we find that the language and scope of section [1226(c)(1)] do not support limiting the non-DHS custodial setting solely to criminal custody that is related to, or that arises from, the basis for detention under that section.

Saysana, 24 I & N Dec. at 605-06 (footnote omitted). In the BIA's view, "the purpose of the section is to impose a duty on the DHS to continue to detain criminal and terrorist aliens pending the completion of proceedings to remove such aliens from the United States once they are no longer in the custody of another entity." Id. at 606. The BIA observed that "Congress was presumably aware that aliens may commit multiple offenses and may come into non-DHS custodial authority in a variety of ways." Id. The BIA concluded that it was "illogical to suppose that Congress would not have wanted to require the DHS to detain a criminal or terrorist alien as set forth in sections [1226(c)(1)(A)-(D)] pending completion of proceedings to remove the alien from the United States solely because the alien had been released from non-DHS custody for an

- 8 -

additional offense." Id. (emphasis in original). The BIA also believed that the history of the provision supported its interpretation:

Thus, for well over a decade Congress has expressed through legislation its intent that criminal and terrorist aliens should generally, if not always, be detained until the completion of their immigration proceedings. The legislation indicates that Congress views criminal and terrorist aliens as threats to persons and property in the United States who should be segregated from society until a decision can be made regarding whether they will be allowed to remain in this country. It further reflects that Congress views them as poor bail risks who have little likelihood of relief from removal and who therefore have little incentive to appear for their hearings if they are released from custody, regardless of family and community ties. While the "released" language of the IIRIRA limits to manageable proportions the numbers of such aliens that come into contact with the DHS, it should not be construed--in light of the predominant statutory purpose--to confer any additional substantive restriction on the categories of aliens that Congress considered subject to mandatory detention, beyond the requirement that they have been released . . . from non-DHS custody.

Id. at 607 (footnote omitted). Thus, the BIA held, "[w]e find that the language of section [1226(c)(1)] does not support limiting the non-DHS custodial setting solely to criminal custody tied to the basis for detention under that section." Id. at 608.

The ruling of the BIA implicates the holding of the Supreme Court of the United States in Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984). Chevron

requires us to conduct a two-part inquiry.  As we have explained in

Succar v. Ashcroft, 394 F.3d 8 (1st Cir. 2005):

> We first ask whether "Congress has directly spoken to the precise question at issue."  Chevron USA, Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984). If so, courts, as well as the agency, "must give effect to the unambiguously expressed intent of Congress."  Id. at 842-43.  As the Supreme Court has said in the immigration context:
>
>> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.  If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.
>
> INS v. Cardoza-Fonseca, 480 U.S. [421,] 447-48 [(1987)] (quoting Chevron USA[,] Inc., 467 U.S. at 843 n.9) (internal quotation marks omitted).  "Chevron [ ] deference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 124 S.Ct. 1236, 1248 (2004).
>
> In determining whether a statute exhibits Chevron-type ambiguity, and hence warrants deference to the Attorney General's interpretation of the statute, courts look at both the most natural reading of the language and the consistency of the "interpretive clues" Congress provided. Gen. Dynamics Land Sys., Inc., 124 S. Ct. at 1240, 1248.  In determining the meaning of a statute, our analysis begins with the language of the statute.  See Leocal v. Ashcroft, 543 U.S. 1, 125 S.Ct. 377, 382 (2004) . . . . .  "[W]e construe language in its context and in light of the terms surrounding it."  Id.  Another "regular interpretive method" is reference to

> statutory history to see if any "serious question . . . even about purely textual ambiguity" is left. Gen. Dynamics Land Sys., Inc., 124 S.Ct. at 1248.

Succar, 394 F.3d at 22-23 (parallel citations omitted; alterations to text in original; emphasis added). If, after applying these interpretive tools, we conclude that the statute is ambiguous, we turn to the second question, id. at 23, specifically, "whether the agency's answer is based on a permissible construction of the statute," Chevron, 467 U.S. at 843. In applying the second step, we must defer to an agency's interpretive regulation unless it is "arbitrary, capricious, or manifestly contrary to the statute." Id. at 844.

## A. Clarity of Statute

The first step of Chevron requires that we focus on the statutory language. Following the counsel of Succar, we give the words of the statute their ordinary meaning unless the context of the statute suggests otherwise. McCarthy v. Bronson, 500 U.S. 136, 139 (1991). When the plain wording of the statute is clear, that is the end of the matter. BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004). We must remember, however, that the "plain meaning" of a statutory provision is often made clear not only by the words of the statute but by its structure as well. Alexander v. Sandoval, 532 U.S. 275, 288 (2001).

In our view, a natural reading of the statutory provision from top to bottom makes clear that the congressional requirement

of mandatory detention is addressed to the situation of an alien who is released from custody for one of the enumerated offenses. The statutory language embodies the judgment of Congress that such an individual should not be returned to the community pending disposition of his removal proceedings. Both the language and the structure of the statutory provision state this mandate in a clear and straightforward manner. As explained by one of our colleagues in the district court in Oscar v. Gillen, 595 F. Supp. 2d 166 (D. Mass. 2009) (Tauro, J.):

> The "when released" provision immediately follows the list of enumerated offenses, indicating that the former modifies the latter. Additionally, § 1226(c) provides that the alien shall be detained upon release regardless of whether he is subsequently arrested for the "same offense," reinforcing the notion that the entire clause applies to the list of enumerated offenses immediately preceding it.

Id. at 170.

The Government submits, however, that "when released" is susceptible to another interpretation. The Government believes that the "released" language must embrace a broader meaning than a release from custody for an enumerated offense because the statute requires mandatory detention for individuals who are removable or inadmissible based on the commission of certain offenses, whether or not they were convicted of those offenses. See § 1226(c)(1)(A) & (D) (referring to other portions of the Immigration and Nationality Act ("INA") not requiring a conviction); Saysana, 24 I

- 12 -

& N Dec. at 605 n.3. It elaborates that there are a variety of "offenses" for which an alien may be inadmissible under 8 U.S.C. § 1182 (and, therefore, subject to mandatory detention under 8 U.S.C. § 1226(c)(1)(A)), but "that may never give rise to a formal charge, let alone an indictment, trial or conviction" (emphasis added). Appellant's Br. at 18; see also Saysana, 24 I & N Dec. at 605 & n.3. "Under these circumstances," the Government continues, "aliens who committed these 'offenses' would not necessarily be subject to criminal or other non-DHS custody." Appellant's Br. at 18-19. Thus, the Government concludes, because § 1226(c)(1)(A)-(D) includes "offenses" for which aliens might not be incarcerated, "when released" must have a broader meaning than the offenses enumerated in the statute.

We believe that this reading of the statutory language is a strained one. While it is true that a conviction is not always a necessary predicate to inadmissibility or removability, see § 1226(c)(1)(A) & (D) (cross-referencing other sections of the Immigration and Nationality Act not requiring a conviction), the plain language of the statute does not render the term "when released" meaningless as applied to these subsections. Individuals may be "released" in connection with the offenses listed without any resulting conviction and be subject, therefore, to mandatory detention, consistent with the statute. For example, an alien could be arrested and released without charges. That an alien

- 13 -

might have committed a listed offense but never come into any form of custody from which "release" triggers mandatory detention does not justify a reading that attaches the serious consequences of the statute to a subsequent, otherwise wholly inconsequential, incident of criminal custody.

A far more natural reading is that the "when released" language applies to an alien who has been detained criminally for one of the listed activities. This reading not only relates the "when released" to the prior language in the subsection, but it also explains the later use of terms related to criminal detention and the use of the term "same offense" at the end of subsection (c)(1).

Indeed, if the reference to "when the alien is released" is read to encompass any release from any non-DHS custodial setting after the expiration of the TPCR,[3] that phrase is completely disjointed from the text that precedes and follows it. As we have noted, the preceding text specifically enumerates offenses relating to removability; the subsequent reference to the "same offense" is only sensibly read to relate back to the aforementioned statutorily listed "offense[s]." Absent a clear direction in the text to read multiple uses of the same term to carry different meanings, we

---

[3] See supra note 2.

shall not do so.[4]  Rather, we shall read the term uniformly throughout the provision.

The Government acknowledges that it is "certainly possible to interpret Congress'[s] use of the term 'for the same offense' as referring to the qualifying offense," but submits that "it is equally plausible that the term refers simply to the 'offense' from whose custody the criminal alien is 'released.'" Appellant's Br. at 20 (emphasis in original).  Under the Government's reading, the term "same offense" can refer back to any offense resulting in a "release."  There are two infirmities in this approach.  First, the term "offense," used in this way, does not appear in the statute.  In essence, the Government's proposed reading untethers not only the "when released" language itself, but also the entire "when released" clause, including its reference to the "same offense," from the remainder of the subsection.  Second, the Government must read a separate, intervening event--post-TPCR non-DHS custody unrelated to the enumerated offenses--into the statute without any direct language to support such a reading. This reading transforms an otherwise straightforward statutory

---

4  See Bailey v. United States, 516 U.S. 137, 146 (1995) (noting that the term "'using a firearm' should not have a different meaning in" two adjacent subsections of the same statute (citation omitted)); Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995) ("[T]he normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks omitted)).

command, relating to specific offenses that Congress itself has identified as warranting special attention, into a mere temporal triggering mechanism. We see no justification in the language or structure of the statute for such a transformation.

In sum, we cannot conclude that the Government's reading is "equally plausible." The structure of the section makes the natural reading of this term refer to the offenses set forth in detail in subsection (c)(1)(A)-(D).[5]

Leaving behind textual and structural arguments, the Government acknowledges that there is no legislative history that "speaks directly to the issue" of whether "'when released' . . . means only release from criminal incarceration for the underlying removable offense." Appellant's Br. at 21. It nevertheless notes that one prior version of the mandatory detention provision required the Attorney General to take the alien into custody "upon completion of the alien's sentence for such conviction." Id. (quoting the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102

---

[5] As a corollary to this point, the Government questions "how an alien convicted of and incarcerated for a removable offense could ever be 'arrested or imprisoned again for the same offense,' given the legal concept of double jeopardy under the Constitution." Appellant's Br. at 20. An alien, however, could be out on bond pending sentencing or could be out of prison on supervised release or probation and, therefore, be subject to re-arrest and re-imprisonment for violation of the conditions of his release. Indeed, the statute itself specifically contemplates these situations. 8 U.S.C. § 1226(c)(1) (noting that the "release[]" as a trigger is unaffected by any conditions such as "parole, supervised release, or probation").

Stat. 4181, 4470). The Government suggests that, because Congress replaced this language, it meant to divorce the custody from the specific conviction.

We approach all arguments based on legislative history with significant caution. Strickland v. Comm'r, Maine Dept. of Human Servs., 48 F.3d 12, 17 (1st Cir. 1995) (noting that, if plain meaning does not answer an interpretive question, "we next examine the legislative history, albeit skeptically, in search of an unmistakable expression of congressional intent" (emphasis added)). Without citation to any relevant explanation for the change in the legislative language, we are reluctant to presume that Congress had such a singular purpose, particularly when other, perhaps more plausible, explanations for the change are also evident. As one district court has noted,

> In explaining the various passages of IIRIRA, the legislature stated that mandatory detention was meant to apply "whenever such an alien is released from imprisonment, regardless of the circumstances of the release." House Conf. Rpt. No. 104-828 at 210-11 (Sept. 24, 1996). Presumably, with that comment, the legislature was seeking to thwart arguments by aliens that because they were subject to parole or other community supervision they could not be taken into immediate immigration detention because that would result in a violation of their imposed conditions. The Court is not persuaded that the legislature was seeking to justify mandatory immigration custody many months or even years after an alien had been released from state custody.

Caseate-Bucco v. Ridge, 317 F. Supp. 2d 1221, 1230 (W.D. Wash.

- 17 -

2004) (adopting the magistrate judge's recommendation). In short, the speculative argument based on legislative history pales in the face of a very strong argument based on text and structure.

In sum, the Government's effort to make § 1226(c)(1) "ambiguous" is strained. Reading the provision as a whole, we think it is clear that the "when released" language relates to the listed offenses in subsection (c)(1)(A)-(D).

## B. Reasonableness of the BIA's Interpretation

If we were to conclude that the statute is ambiguous, Chevron would direct us to defer to the agency's interpretation, provided that it is based on a permissible construction of the statute. 467 U.S. at 843-44; see also Bryson v. Shumway, 308 F.3d 79, 86-87 (1st Cir. 2002) ("If Congress has not spoken on the precise question at issue, we respect the statutory interpretation of the federal administrative agency given that interpretative task, unless the interpretation is unreasonable.").

We have concluded that the text of the statute is clear. Consequently, because the "when released" language is unambiguous, there is nothing for the agency to interpret--no gap for it to fill--and there is no justification for resorting to agency interpretation to address an ambiguity. However, even if we were to conclude that the statute were ambiguous, we could not agree that the BIA's interpretation is a reasonable one.

In addition to the grammatical and logical lapses that we

have discussed earlier, we have additional difficulties with the agency position. First, the agency's interpretation would treat similarly situated individuals differently on the basis of a factor not logically connected to the mandatory detention provision. An alien with a conviction identical to Mr. Saysana's who has not experienced a post-TPCR release from custody would not, the Government admits, be subject to mandatory detention. The Government's defense of this anomalous result is that it is "consistent with Congress'[s] longstanding intent to detain certain criminal aliens." Appellant's Br. at 27. This explanation paints with far too broad a brush. The mandatory detention provision does not reflect a general policy in favor of detention; instead, it outlines specific, serious circumstances under which the ordinary procedures for release on bond at the discretion of the immigration judge should not apply. The non-retroactivity of the provision hardly undercuts the purposes of mandatory detention; instead, it serves important practical governmental interests in the administration of the enforcement program.[6] More importantly,

_____

[6] We note that, in crafting the new provisions, Congress not only made explicit that only releases after the effective date would trigger mandatory detention, but it further provided the Attorney General (then responsible for the Immigration and Naturalization Service) with the authority to request extensions of the effective date. See IIRIRA § 303(b)(2). As a result, the system operated with less strident mandatory detention standards in place for two years following enactment under the transition rules. Although Congress clearly expressed concern about aliens who had committed qualifying offenses, it declined to begin immediately prospective application of the detention provisions to aliens with

- 19 -

finding that the "when released" language serves this more limited but focused purpose of preventing the return to the community of those released in connection with the enumerated offenses, as opposed to the amorphous purpose the Government advances, avoids attributing to Congress the sanctioning of the arbitrary and inconsequential factor of any post-TPCR custodial release becoming the controlling factor for mandatory detention.

Even more significantly, the Board's reasoning in adopting its interpretation rests on a series of speculative conclusions. Specifically, the Board concludes that the interpretation it adopts is consistent with what it perceives to be the understanding of Congress regarding aliens such as Mr. Saysana: They are "threats to persons and property in the United States who should be segregated" pending a decision on removal; they are "poor bail risks"; they have "little likelihood of relief from removal and . . . therefore have little incentive to appear for their hearings . . ., regardless of family and community ties." Saysana, 24 I & N Dec. at 607. The Board cites no authority that Congress's finely tuned legislative product was premised on such unsupported assumptions. Indeed, Congress was no doubt aware that, under some

_____

releases after enactment, let alone retrospective application to aliens with prior releases. Our reading attributes to the text the same sensible acknowledgment of the important practical governmental interests in the administration of the immigration enforcement program that justified the initial delay. It is fully consistent with the purposes and the application of the limited system of mandatory detention created by Congress.

circumstances, aliens with criminal histories that predate the passage of IIRIRA remain eligible for forms of relief not available to aliens with more recent criminal convictions. See generally INS v. St. Cyr, 533 U.S. 289, 326 (2001) (holding that relief under INA § 212(c), 8 U.S.C. § 1182(c), repealed by the 1996 amendments to the Act, remained available for certain categories of aliens with convictions obtained prior to the amendments). In addition, it is counter-intuitive to say that aliens with potentially longstanding community ties are, as a class, poor bail risks. The affected aliens are individuals who committed an offense, and were released from custody for that offense, more than a decade ago. They have continued to live in the United States. By any logic, it stands to reason that the more remote in time a conviction becomes and the more time after a conviction an individual spends in a community, the lower his bail risk is likely to be. See Garcia v. Shanahan, 615 F. Supp. 2d 175, 183 (S.D.N.Y. 2009) (endorsing the conclusion reached in Hy v. Gillen, 588 F. Supp. 2d 122, 126 (D. Mass. 2008), that "the Government's reading sweeps in the group of criminal aliens most likely to qualify for a bond because only prior criminals who have been released for at least ten years are affected by the interpretation").[7]

---

[7] The history of the particular proceedings now before us further draws the validity of the conclusions themselves into question. As this case initially came before this court, it was consolidated with another case of a similarly situated alien. Hy v. Gillen, No. 09-1182. The companion case was dismissed as moot

We do not dispute that Congress has determined that the specified offenses in the mandatory detention provision are of a particularly serious nature warranting greater restrictions on liberty pending removal proceedings. However, this purpose is not sensibly advanced by the Government's position, which, as we have noted, draws an arbitrary distinction between individuals who, with respect to the serious crime with which the statute concerns itself, are identical.

In view of the logical leaps the Government's position entails, we must conclude that, even if the statute were ambiguous, the Government's interpretation is not reasonable.

## III. CONCLUSION

We conclude that the meaning of the statute is clear on the issue before us; the statute contemplates mandatory detention following release from non-DHS custody for an offense specified in the statute, not merely <u>any</u> release from <u>any</u> non-DHS custody. We further conclude that, even if the statute were ambiguous, the interpretation of the Board is not reasonable. Accordingly, we must affirm the judgment of the district court.

**AFFIRMED.**

---

upon notice to the court by the parties that the alien was granted relief from removal. <u>Id.</u>, Notice of Petitioner-Appellee, Attach. 1 (Order the BIA (May 21, 2009)).