Clayton Richard GORDON, on behalf of himself and others similarly situated, Plaintiff/Petitioner

v.

Jeh Charles JOHNSON, Secretary of Homeland Security; Eric H. Holder, Jr., Attorney General of the U.S.; John Sandweg, Acting Director, Immigration and Customs Enforcement; Sean Gallagher, Acting Director, Immigration and Customs Enforcement; Christopher Donelan, Sheriff of Franklin County; Michael G. Bellotti, Sheriff of Norfolk County; Steven W. Tompkins, Sheriff of Suffolk County; Thomas M. Hodgson, Sheriff of Bristol County; and, Joseph D. McDonald, Jr., Sheriff of Plymouth County, Defendants/Respondents.

C.A. No. 13–cv–30146–MAP.

United States District Court, D. Massachusetts.

Dec. 31, 2013.

Adriana Lafaille, Matthew Segal, American Civil Liberties Union, Boston, MA,

Elizabeth A. Badger, Lutheran Social Services, Worcester, MA, Eunice Lee, Michael Tan, American Civil Liberties Union Federation, San Francisco, CA, Judy Rabinovitz, American Civil Liberties Union, New York, NY, for Plaintiff/Petitioner.

Aram A. Gavoor, United States Department of Justice, Washington, DC, Karen L. Goodwin, United States Attorney's Office, Springfield, MA, for Defendants/Respondents.

*MEMORANDUM AND ORDER REGARDING PLAINTIFF'S PETITION FOR WRIT OF HABEAS CORPUS, PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, and DEFENDANTS' MOTION TO DISMISS*

(Dkt. No. 1, 2 & 13)

PONSOR, District Judge.

## I. *INTRODUCTION*

Plaintiff, a lawful permanent U.S. resident held by the government pursuant to 8 U.S.C. § 1226(c), brought a petition for writ of habeas corpus on behalf of himself and those similarly situated. (Dkt. No. 1.) He sought an individualized bond hearing to challenge his ongoing detention by immigration authorities. Defendants are: Jeh Charles Johnson, Secretary of Homeland Security; Eric Holder, Attorney General; John Sandweg, Acting Director of Immigrations and Customs Enforcement (ICE); Sean Gallagher, Acting Field Office Director for the New England Field Office of ICE; Christopher Donelan, Sheriff of Franklin County; Michael Bellotti, Sheriff of Norfolk County; Steven Tompkins, Sheriff of Suffolk County; Thomas Hodgson, Sheriff of Bristol County; and Joseph McDonald, Jr., Sheriff of Plymouth County. In addition to his petition for habeas corpus, Plaintiff filed a Motion for a Preliminary Injunction. (Dkt. No. 2.) Defendants also submitted a Motion to Dismiss. (Dkt. No. 13.)

On October 23, 2013, 2013 WL 5774843, this court granted Plaintiff's individual habeas petition, denied without prejudice Plaintiff's Motion for a Preliminary Injunction, and denied Defendants' Motion to Dismiss.[1] This memorandum provides a more detailed explanation of the court's reasoning.

## II. *BACKGROUND* [2]

As the facts of this case can only be understood in the context of the statute, a brief discussion of the law is necessary before laying out the factual background.

### A. *Statutory Framework*

Section 1226 of Title 8 governs the detention of noncitizens during immigration removal proceedings. Sub-section (a) provides discretionary authority to the government to take an alien into custody while a decision on removal is pending. A noncitizen detained under § 1226(a) is entitled

---

**1.** Defendants argue that dismissal as to all of the Defendants except Defendant Donelan is required because habeas relief must "be directed to the person having custody of the person detained." 28 U.S.C. § 2243. In cases of physical confinement, the immediate custodian is the proper respondent. *Rumsfeld v. Padilla*, 542 U.S. 426, 439, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004). Given the class-wide allegations, however, dismissal at this point is inappropriate. Furthermore, the

"immediate custodian rule" might not apply where the relief sought is a bond hearing and not immediate release. *See Bourguignon v. MacDonald*, 667 F.Supp.2d 175, 179–180 (D.Mass.2009).

**2.** There is no dispute as to the facts, and the question before the court is one purely of law. The facts are drawn from Plaintiff's complaint. (Dkt. No. 1.)

to an individualized bond hearing to determine whether release pending removal is appropriate. 8 C.F.R. §§ 1003.19 & 1236.1(d); *Matter of Guerra,* 24 I. & N. Dec. 37, 37–38 (BIA 2006). Sub-section (a) provides:

> On a warrant issued by the Attorney General, an alien *may* be arrested and detained pending a decision on whether the alien is to be removed from the United States. *Except as provided in subsection (c) of this section* and pending such decision, the Attorney General—
>
> (1) may continue to detain the arrested alien; and
>
> (2) may release the alien on—
>
> (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General, or
>
> (B) conditional parole; but
>
> (3) may not provide the alien with work authorization (including an "employment authorized" endorsement or other appropriate work permit), unless the alien is lawfully admitted for permanent residence or otherwise would (without regard to removal proceedings) be provided such authorization.

8 U.S.C. § 1226(a) (emphasis added).

Sub-section (c) of the law eliminates this discretion with respect to certain non-citizens. This provision requires detention pending removal, and, unlike sub-section (a), it does not explicitly provide for individualized bond hearings. Sub-section (c) reads as follows:

> (1) Custody
>
> The Attorney General *shall* take into custody any alien who—
>
> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>
> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), A(iii), (B), (C), or (D) of this title,
>
> (C) is deportable under section 1227(a)(2)(A)(I) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or
>
> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> *when the alien is released,* without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.
>
> (2) Release
>
> The Attorney General may release an alien described in paragraph (1) only if the Attorney General decides pursuant to section 3521 of title 18 that release of the alien from custody is necessary to provide protection to a witness, a potential witness, a person cooperating with an investigation into major criminal activity, or an immediate family member or close associate of a witness, potential witness, or person cooperating with such an investigation, and the alien satisfies the Attorney General that the alien will not pose a danger to the safety of other persons or of property and is likely to appear for any scheduled proceeding. A decision relating to such release shall take place in accordance with a procedure that considers the severity of the offense committed by the alien.

8 U.S.C. § 1226(c) (emphasis added).

**B.** *Factual Background*

Plaintiff Clayton Richard Gordon, a native of Jamaica, arrived in the U.S. in 1982

at age six as a lawful permanent resident. Plaintiff joined the National Guard in 1994 and then served in active duty with the U.S. Army. He was honorably discharged in 1999.

In 2008, Plaintiff was arrested after police found cocaine in his home. Within one day of his arrest, he was released from custody. Plaintiff pled guilty in state court to a charge of possession of narcotics with intent to sell, for which he received a seven-year suspended sentence and three years of probation. He successfully completed his probation without incident.

Since that arrest, Plaintiff has re-established himself as a productive member of society. He met his current fiancee around 2008, and the couple had a son in 2010. They purchased a home together in Bloomfield, Connecticut. Plaintiff developed a successful business and has worked on a project to open a halfway house for women released from incarceration.

On June 20, 2013, while driving to work, Plaintiff was unexpectedly stopped by ICE agents. He was taken into ICE custody and detained at the Franklin County Jail and House of Correction in Greenfield, Massachusetts. Defendants, relying on the 2008 criminal conviction, invoked the mandatory provisions of § 1226(c) to detain Plaintiff without the opportunity for an individualized bond hearing.

Plaintiff filed this petition for Writ of Habeas Corpus on his own behalf and on behalf of a class of similarly situated individuals, seeking an individualized bond hearing. He also filed a Motion for a Preliminary Injunction.[3] Defendants moved to dismiss the case.

On October 23, 2013, the court granted Plaintiff's individual habeas petition, denied without prejudice Plaintiff's Motion for a Preliminary Injunction, and denied Defendants' Motion to Dismiss.[4]

## III. *DISCUSSION*

In their submissions and at oral argument, both parties urged the court to rule on the underlying merits of the habeas petition. The parties agreed that the case hinged on the interpretation of the phrase "when the alien is released" in § 1226(c)(1).

Defendants contend that the phrase indicates the time at which it *can* begin to act, rather than setting the time at which it *must* act. Defendants raise two arguments in support of this interpretation. First, the court must defer to the Board of Immigration Appeal's (BIA) decision in *Matter of Rojas*, 23 I. & N. Dec. 117 (BIA 2001), because the statute—specifically, the word "when"—is ambiguous. The BIA's reading is a permissive construction because it is consistent with the plain language and purpose of the statute. Deference is therefore required under *Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Second, Defendants invoke favorable Third and Fourth Circuit decisions relying on the "loss of authority" line of cases.[5]

---

3. Plaintiff also filed a Motion to Certify a Class, (Dkt. No. 16), which is pending before the court.

4. The history of the case subsequent to the court's rulings is straightforward. On November 1, 2013, Defendants notified the court that Mr. Gordon was being held pursuant to § 1226(a), and a bond hearing had been scheduled. (Dkt. No. 51.) A hearing was held on November 6, 2013, and bond was set at $25,000. (Dkt. No. 59.) On November 18, 2013, Plaintiff posted bond and was released from custody. (*Id.*) Plaintiff has since amended his complaint to include additional Plaintiffs. (Dkt. No. 72.)

5. Defense counsel suggested at oral argument that the "loss of authority" principle can be analyzed as part of the *Chevron* analysis or as

They suggest that adopting Plaintiff's interpretation impermissibly imposes a sanction on the government for failing to act in a specific, limited period of time.

Defendants' arguments are unpersuasive. The plain language of this statute sets forth an immediacy requirement. Furthermore, the purposes underlying the section and the structure of § 1226 amply support that reading. Thus, no deference to the BIA opinion is appropriate.

Even if there were an ambiguity in the statutory language, the BIA's argument goes too far. Its interpretation fails to recognize *any* temporal limitation on the government's ability to act. It also shifts unintended discretion to the executive branch, yielding arbitrary and capricious results, of which this case provides a prime example.

Finally, the "loss of authority" cases do not apply to this statute. Under Plaintiff's proposed interpretation of 1226(c) the government does not lose any power, since it still has the full authority to detain aliens pending removal under § 1226(a). Indeed, it is crucial to emphasize what is, and what is not, at issue in this case. The question before the court is *not* whether a convicted alien who is not taken into ICE custody "when released" from his criminal detention should be forever free from any risk of ICE detention. The much narrower question is whether an alien in this position is entitled to a hearing at which an Immigration Judge can consider the *possibility* of releasing the alien on conditions. Obviously, in many cases the upshot of this hearing will be a prompt denial of conditions, and immediate detention. The pivotal question, however, is whether any hearing will ever take place once a previously convicted alien is taken into custody

at *any time* after his release from criminal detention.

## A. *Chevron Deference*

■ The court must apply a two-step *Chevron* analysis to determine whether deference is due to an agency's interpretation of its governing statute. *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778. Step one asks "whether Congress has directly spoken to the precise question of law." *Id.* at 842, 104 S.Ct. 2778. A court should use the ordinary tools of statutory interpretation, starting with the text, to elucidate the meaning of any statutory language. *Id.* at 842–43 n. 9, 104 S.Ct. 2778. If Congress has spoken clearly, that unambiguous language is given effect, and the analysis ends. However, if the statute is ambiguous, then a court proceeds to step two of *Chevron*. There, the question is whether the agency's interpretation is a "permissible" one.

### 1. *Chevron Step One*

It is impossible to read "when … released" as ambiguous without rendering it meaningless. This conclusion is unavoidable in light of both the plain language of the statute and the broader purpose and structure of the law.

#### a. *Plain Language*

The core of any statutory analysis is the language itself. "When the plain wording of the statute is clear, that is the end of the matter." *Saysana v. Gillen*, 590 F.3d 7, 13 (1st Cir.2009), *citing BedRoc Ltd., LLC v. U.S.*, 541 U.S. 176, 183, 124 S.Ct. 1587, 158 L.Ed.2d 338 (2004). A court "must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat.*

---

an independent justification for the government's interpretation of its authority. (Tr. of Mot. Hr'g, at 27, Dkt. No. 48.) Although each

analysis yields the same result, the arguments will be considered independently.

*Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (citations omitted).

■ The most natural construction of the phrase "when the alien is released" is "at the time of release." A majority of district courts, including Judge William G. Young in this district, have agreed. *See e.g., Castaneda v. Souza,* 952 F.Supp.2d 307 (D.Mass.2013); *Baquera v. Longshore,* 948 F.Supp.2d 1258, 1262 n. 3 (D.Colo. 2013) (compiling cases). This interpretation of the five words "at the time of release" requires no manipulation; it simply flows from the phrase's usual meaning. Conversely, Defendants' proposed interpretation, "at any point after release," requires wrenching the phrase out of its normal context. The obvious manhandling of language proposed by Defendants is highlighted by looking at other language Congress could easily have used, assuming its intent followed Defendants' proposed construction, and by examining the effect of removing the phrase from the statute.

If Congress intended the open-ended grant of power Defendants claim, it had far more precise language available. In fact, Congress has never been shy about utilizing broad language to set the time at which a party can begin to act. But, when Congress desires such an outcome, it uses *explicit* language.

For example, if Congress wanted the executive to detain an individual "any time after" release from custody, it could simply have used the phrase "any time after," as it has in numerous other statutes. *See e.g.,* 8 U.S.C. § 1227(a)(2)(A)(ii); 10 U.S.C. § 12687; 10 U.S.C. § 14112; 14 U.S.C. § 323(c); 16 U.S.C. § 19jj–4; 42 U.S.C. 17385(d); 43 U.S.C. § 542; 46 U.S.C. § 40701(b). Alternatively, Congress could have said "at any point after." *See e.g.,* 42 U.S.C. § 1395cc–4(c)(1)(B). An even simpler "thereafter" would have sufficed to convey the open-ended authority Defendants claim. *See e.g.,* 12 U.S.C. § 3020; 16 U.S.C. § 18f–1. In sum, had Congress actually intended the result Defendants advocate, a plethora of words and phrases easily available to Congress would have been more appropriate.

Perhaps more importantly, Defendants' meaning renders the phrase "when the alien is released" superfluous. One elementary canon of statutory interpretation dictates that "a statute should be construed so that effect is given to all its provisions, so no part will be inoperative or superfluous, void or insignificant." *Corley v. U.S.,* 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009) *quoting Hibbs v. Winn,* 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (further citations omitted).

Here, if one removes the phrase "when the alien is released" from § 1226(c), the only limits that remain are the enumerated categories. In that hypothetical case, the statute would allow the government to detain, without limit, any individual who falls into one of those categories. That, however, is identical to Defendants' current reading of the statute.

Defendants argue that the phrase does serve a purpose; it states the time at which the government can begin to act. Without the phrase, the executive is directed to detain specified individuals, but not told when it can begin to do so.

Silence, however, yields the same result. Put differently, if Defendants' construction of the phrase "when the alien is released" prevailed, the phrase simply would not be needed at all. It is physically impossible for ICE to detain an individual *before* he is released from criminal custody. ICE can only begin to act once the alien is released. Thus, under Defendants' interpretation, whether the phrase "when the alien is

released" is inserted into § 1226(c) is irrelevant, making the phrase "inoperative or superfluous." This is contrary to a basic rule of statutory construction. *See Corley*, 556 U.S. at 314, 129 S.Ct. 1558.

In short, strictly based on the words of the statute themselves, it is flatly implausible to read "when ... released" as suggesting anything but "at the time of release." This plain-language interpretation is powerfully supported by the purpose and structure of § 1226(c).[6]

### b. *Congressional Purpose*

To illuminate the meaning of a statute, it may be necessary to examine Congress's purpose in enacting the law. *See e.g., Kasten v. Saint–Gobain Performance Plastics Corp.,* —— U.S. ——, 131 S.Ct. 1325, 1333, 179 L.Ed.2d 379 (2011). With respect to § 1226(c), there are two relevant cases that illustrate Congress's intent. Together, they confirm that Congress undoubtedly intended to grant extensive power to the executive to detain certain aliens pending removal proceedings. Equally clearly, however, these cases describe only limited circumstances where detention is permitted without a bond hearing.

In *Demore v. Kim,* 538 U.S. 510, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003), the Supreme Court upheld the constitutionality of § 1226(c) and outlined its view of Congress's intent. Congress was concerned with an increase in criminal convictions among non-citizens, paired with a decrease in the ability to deport those same individuals. *Id.* at 518, 123 S.Ct.

1708 ("Congress adopted this provision against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens."). Specifically, Congress was concerned with the threat of recidivism, flight risk, and the inability to identify and locate the individuals once released. *See id.* at 518–22, 123 S.Ct. 1708. The Congressional record supported that analysis. *Id. citing* Criminal Aliens in the United States: Hearings before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs, 103d Cong., 1st Sess. (1993); S.Rep. No. 104–48 (1995); S.Rep. No. 104–249 (1996).

To deal with these problems, Congress authorized *immediate* immigration detention for certain individuals. The obvious goal was to ensure the *direct* transfer of potentially dangerous and elusive individuals from criminal custody to immigration authorities. Therefore, an extraordinary and limited power was provided to the executive to hold individuals without giving these individuals any opportunity for release. The intent animating this Congressional authorization is hardly vindicated by a distorted interpretation of the statute that would allow immigration authorities to take someone into custody without a right to a bond hearing, such as Plaintiff, who has been in the community living a law-abiding life for five years.

Following *Demore's* recognition of the executive's broad power to effectuate the true purpose underlying § 1226(c), *Saysa-*

---

**6.** It is possible, of course, to reduce this court's reading of the phrase "at the time of release" to absurdity by contracting the permissible time frame. Is the court suggesting that an alien must be detained within an hour of release? Within thirty seconds? The time frame at issue in this case—five years of law-abiding life between a one-day criminal detention and apprehension by ICE—renders any such quibbling irrelevant. *See Castaneda,* 952 F.Supp.2d at 321 ("While it has no occasion in this case to determine what constitutes a reasonable period of time, this Court would suggest that any alien who has reintegrated back into his community has not been detained within such a reasonable period of time.").

*na v. Gillen*, 590 F.3d 7, 13 (1st Cir.2009), focused on the associated limits to that authority. In *Saysana*, the court was asked whether § 1226(c) justified the mandatory detention of a non-citizen released from criminal custody for an offense enumerated in § 1226(c) before the 1998 effective date of the provision but who, after that 1998 date, was released for a separate, non-categorized offense. *Saysana*, 590 F.3d at 9–10. The First Circuit concluded, quite reasonably, that an individual could *only* be detained under § 1226(c) after release for one of the enumerated crimes. *Id.* at 18.

■ The court explained, "We do not dispute that Congress has determined that the specified offenses in the mandatory detention provision are of a particularly serious nature warranting greater restrictions on liberty pending removal proceedings." *Id.* Nevertheless, the court said, "The mandatory detention provision does not reflect a general policy in favor of detention; instead, it outlines specific, serious circumstances under which the ordinary procedures for release on bond at the discretion of the immigration judge should not apply." *Id.* at 17. In essence, while Congress intended to grant broad authority to the executive to detain aliens pending their removal, § 1226(a) was intended to be the norm, with § 1226(c) a limited exception.

■ The confluence of these two cases clearly outlines a limited regime of mandatory detention, one where Congress envisioned the *immediate* (or, at a minimum, reasonably prompt) transfer from criminal custody to immigration detention. Congress's concern was with individuals whose criminal propensity or risk of flight, or both, rendered quick and mandatory detention critical. Under this rationale a five-year gap between criminal release and ICE mandatory detention makes no sense

whatsoever. Both the Supreme Court's *Demore* decision and the subsequent First Circuit decision in *Saysana* support this common-sense conclusion.

■ Congress's goal in enacting 1226(c) simply does not apply when a person has re-integrated into society. The *Saysana* court said it best with respect to the threat of bail risks:

> [I]t is counter-intuitive to say that aliens with potentially longstanding community ties are, as a class, poor bail risks. The affected aliens are individuals who committed an offense, and were released.... They have continued to live in the United States. By any logic, it stands to reason that the more remote in time a conviction becomes and the more time after a conviction an individual spends in a community, the lower his bail risk is likely to be.

*Id.* at 17–18.

■ Plaintiff's life, as noted, is a case in point. In the time since his release from custody for the original offense, Plaintiff has had a son, purchased a home, and developed a successful business. He has worked for the good of the community to open a halfway house. While he may have fit the category of individuals Congress was concerned with when he was first released, at this point he falls far outside it. Under these circumstances, the only clear inference to draw from the statute as a whole is that Plaintiff should, at least, have an *opportunity* to present arguments supporting release to an Immigration Judge—which, as of the date of this memorandum, he has done successfully.

### c. Structure

The structure of a statute often assists a court in construing the meaning of its words. *Id.* at 13–14. As Judge Young pointed out in *Castaneda*, two aspects of

the structure of § 1226(c) support Plaintiff's view of the plain language.

First, as *Saysana* emphasized, § 1226(c) is a limited exception in the broader detention scheme. *Castaneda*, 952 F.Supp.2d at 314–15. Normally, a strong presumption exists in favor of discretionary detention and individualized bond hearings. Section 1226(a) is the default route if the government wishes to detain a non-citizen; § 1226(c) offers no more than a narrow exception.

The structure within § 1226(c) itself also favors Plaintiff's reading. *Id.* at 315–16. Section 1226(c) is broken up into two subsections: 1226(c)(1) provides a definition, and 1226(c)(2) offers a limited exception to mandatory detention. Each, respectively, should be read on its own.

The phrase, "when the alien is released" is included in the definitional section. The placement of the phrase in that section suggests that the five words are intended to serve as a limit. They help to define the group of non-citizens subjected to § 1226(c) as those who commit a crime in an enumerated category *and* are detained upon release.

However, giving the phrase "when the alien is released" Defendants' meaning disjoints that clause from the remainder of § 1226(c)(1). Under Defendants' interpretation, an alien can be subjected to § 1226(c) regardless of when he or she is released. That reading entirely uproots the phrase from its context. *See id.*

In sum, the plain language of the statute indicates that "when ... released" simply means "at the time of release." The congressional intent behind the law and the structure of the Act powerfully support that reading. Since Congress has spoken clearly on this issue, the *Chevron* analysis ends at step one.

### 2. *Chevron Step Two*

Even if the statute were ambiguous, which it is not, Defendants' interpretation would still falter under step two of the *Chevron* framework.

At *Chevron* step two, a court must ask whether the executive's interpretation of the statute is a "permissible" one. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. An agency's interpretation will be binding "unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *U.S. v. Mead Corp.*, 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (citations omitted). Specifically, deference to an agency's construction of statutory language will "depend upon the thoroughness evident in its consideration, the validity of its reasoning, [and] the consistency with earlier and later pronouncements." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

Defendants' interpretation would stumble at this second level of analysis (assuming that level were reached) because it is flatly unreasonable as a matter of ordinary usage and exhibits arbitrariness and caprice in its application. The most glaring problem with Defendants' reading is the complete absence of *any* temporal limitation on the executive's ability to act. Defendants insist that the statute mandates detention at *any* point after the Attorney General has decided to remove an individual for a reason enumerated in § 1226(c). Immigration authorities could wait ten, twenty, or thirty years, if they wished, before detaining an alien without any right to a bail hearing, even where the alien had lived an exemplary life for all those decades.

This outcome is not only patently unreasonable, but is inconsistent with a fundamental principle underlying our sys-

tem of justice: except in the rarest of circumstances, the state may not postpone action to deprive an individual of his or her liberty indefinitely. Time limits "promote repose by giving security and stability to human affairs," thus allowing a defendant to move on with his life. *Wood v. Carpenter,* 101 U.S. 135, 139, 25 L.Ed. 807 (1879).

That principle weighs heavily against Defendants in this case. A non-citizen, convicted of a crime, released from criminal custody, and resuming his life without any further offense for years, should not spend his days in indefinite peril of detention without any opportunity even to seek provisional release. Since Defendants' interpretation has this grossly arbitrary result, it is impermissible under step two of *Chevron.*

The second problem with Defendants' interpretation is that it has the potential to yield utterly capricious results. Defendants vigorously argue that Section 1226(c) affords them no discretion; they *must,* they say, detain Plaintiff without any bail hearing. In their view, Congress has required them to detain, without hearing, *all* individuals who fall into a § 1226(c) category, no matter how large the gap between a person's release from criminal custody and immigration detention. However, Defendants' interpretation creates precisely the discretion Congress sought to avoid and capriciously subjects similarly situated non-citizens to grossly disparate treatment.

Consider the following. Two non-citizens have committed a crime enumerated in § 1226(c), have served the same sentence, and are both released from custody the same day. Under Plaintiff's interpretation, if ICE wished to detain the individuals *without bail,* it must take them both

into custody · at the time of their release from criminal custody. The two would be treated, under the statute, identically.

Under Defendants' reading, the statute gives the executive branch the power to treat these two individuals differently. One person may be held without bail on the day he is released from criminal custody. The other, for whatever reason, may be allowed to return to his family and community for years before the executive moves to detain him or her. This scenario gives the executive discretion to select who will be detained immediately upon release and who will be allowed to return to the community indefinitely. Given that Congress desired to *eliminate,* not broaden, discretion through this statute, that outcome makes zero sense. Plaintiff's reading creates far more consistency in the statute itself, especially since ICE always retains the ability to seek detention of an alien at any time after his apprehension through a hearing before an Immigration Judge.

For all these reasons, even if Plaintiff's interpretation had not been clear from the plain words and clear import of the statute, the court would still be obliged to adopt it given the grave flaws in Defendants' proposed construction.[7]

## B. *The Loss of Authority Cases*

 Both the Third and Fourth Circuit, to different degrees, rely on the "loss of authority" line of cases to uphold Defendants' interpretation of 1226(c). *Sylvain v. Att'y Gen. of U.S.,* 714 F.3d 150 (3d Cir.2013); *Hosh v. Lucero,* 680 F.3d 375 (4th Cir.2012). In *U.S. v. Montalvo–Murillo,* the Supreme Court stated the general principle that "construction of the [Bail

---

7. Plaintiff also argues that the Rule of Lenity ˙ and Canon of Constitutional Avoidance require the court to adopt his interpretation. It

is not necessary to reach these contentions given the simpler line of logic adopted here.

Reform Act] must conform to the 'great principle of public policy,' applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided." 495 U.S. 711, 718, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990). In additional cases, the Court made clear that "If a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." *U.S. v. James Daniel Good Real Prop.*, 510 U.S. 43, 63, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (citations omitted). In other words, absent a clear Congressional directive, a court should not strip power from the executive branch simply because the executive fails to act in a timely manner.

Drawing on this principle, the Third and Fourth Circuits concluded that it would be impermissible to read § 1226(c) as intending the phrase "at the moment of release" to signify "at the moment of release and not later." *Hosh*, 680 F.3d at 380. To do so, these courts suggested, would be to enact a penalty where none was intended.

In making this argument, the *Sylvain* court analogized § 1226(c) to the Speedy Trial Act ("STA"). 714 F.3d at 160. The Third Circuit offered that statute to illustrate the clarity with which Congress speaks when it wants a deadline to have bite. The STA explicitly precludes prosecution if a trial is not held within a certain period of time after a plea is tendered. 18 U.S.C. § 3161(c)(1). The loss of the right to detain without a bail hearing, the argument runs, has no equivalent statutory mandate.

Like other courts, this court is not persuaded that this analogy holds up. *See e.g., Castaneda*, 952 F.Supp.2d at 318–19; *Castillo v. ICE Field Office Dir.*, 907 F.Supp.2d 1235, 1239 (W.D.Wash.2012).

The essence of the "Loss of Authority" cases, as noted, is that a court should not intervene to strip power from the executive branch unless Congress explicitly directs it to. The principle thus applies in cases where judicial action would *remove* power from the executive. For instance, in *Montalvo–Murillo,* the executive would have been precluded from detaining certain individuals. *Montalvo–Murillo,* 495 U.S. at 717–18, 110 S.Ct. 2072. In another case Defendants rely on, *Brock v. Pierce Cnty.,* the executive would have been prohibited from recovering misused government funds had the Court ruled against the Secretary of Labor. 476 U.S. 253, 254, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986).

That critical component, elimination of authority, is missing here. The relevant grant of authority in § 1226 is the power to detain an individual pending removal proceedings. *That* authority has its genesis in § 1226(a). Section (c) is merely an exception that, in limited cases, alters the method by which that authority is carried out. Giving § 1226(c) its plain meaning here does not limit or prevent the government from detaining individuals pending removal. The fair construction of the statute only has the effect of circumscribing the executive's power to detain a person *without a hearing.* The extraordinarily powerful sanction set forth in the STA—the prohibition of a prosecution of a criminal, with or without prejudice—offers no supportive analogy for Defendants' proposed construction of 1226(c).

## IV. *CONCLUSION*

For the foregoing reasons, the court ALLOWED Plaintiff's Writ of Habeas Corpus (Dkt. No. 1), DENIED Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 2) without prejudice, and DENIED

Defendant's Motion to Dismiss (Dkt. No. 13).